35 F.3d 585
 39 ERC 1658, 308 U.S.App.D.C. 268, 25
Envtl. L. Rep. 20,191
 STATE OF IDAHO, BY AND THROUGH IDAHO PUBLIC UTILITIES
COMMISSION; Hecla Mining Co.; ASARCO, Inc.;
Coeur d'Alene Mines Corp., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Union Pacific Railroad Co., Coeur d'Alene Tribe, Intervenors.
 No. 93-1015.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 20, 1994.
Decided Oct. 4, 1994.
 
 Petition for Review of an Order of the Interstate Commerce Commission.
 Donald L. Howell II, Deputy Atty. Gen., Boise, ID, for the State of Idaho, with whom Thomas F. McFarland, Jr., Chicago, IL, Nathaniel K. Adams, Coeur d'Alene, ID, and Fred Gibler, Kellogg, ID, were on the briefs, for petitioners.
 Evelyn G. Kitay, Atty., I.C.C. ("ICC"), with whom Henri F. Rush, Acting Gen. Counsel, ICC, Ellen D. Hanson, Sr. Associate Gen. Counsel, ICC, Anne K. Bingaman, Asst. Atty. Gen., John J. Powers III, Andrea Limmer, and John A. Bryson, Attys., U.S. Dept. of Justice, Washington, DC, were on the briefs, for respondents.
 Raymond C. Givens, Coeur d'Alene, ID, argued the cause and filed the brief, for intervenor Coeur d'Alene Tribe.
 Joseph D. Anthofer, Omaha, NE, was on the brief, for intervenor Union Pacific R. Co.
 Before BUCKLEY, WILLIAMS, and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 The State of Idaho and three mining companies ("petitioners") mount environmental and economic challenges to an order of the Interstate Commerce Commission authorizing the abandonment of the Wallace Branch, a stretch of railroad track in northern Idaho. The order allows the Union Pacific Railroad Company to discontinue service on the Branch and to salvage the rails and other materials subject to certain conditions. The Coeur d'Alene Tribe has intervened, arguing that the Commission should have required Union Pacific to clean up alleged pollution on the Branch.
 
 
 2
 We affirm in part and remand in part. The Commission reasonably found that the Wallace Branch was unprofitable and thus properly permitted Union Pacific to discontinue service under the Interstate Commerce Act. In addition, the Commission correctly concluded that it lacked authority to grant the relief sought by the Coeur d'Alene Tribe; and although the Commission violated the Endangered Species Act, this violation was harmless because the Commission promised to evaluate the biological impact of any salvage activities before authorizing them. The Commission failed, however, to take a hard look at the potential environmental consequences of salvage activity as required by the National Environmental Policy Act.
 
 I. BACKGROUND
 
 3
 For years, the Wallace Branch has been a transportation link for mining companies and other shippers in the Silver Valley, the largest silver-producing area in the world. The Branch runs east-west for 71.5 miles across northern Idaho, traversing the Bunker Hill toxic waste site, Heyburn State Park, the Coeur d'Alene Indian Reservation, and the Coeur d'Alene River Wildlife Management Area. The Wildlife Management Area is a mostly state-owned habitat for various fish and wildlife, including the bald eagle, a species currently listed as "endangered" under the Endangered Species Act. See 16 U.S.C. Secs. 1532(20), 1533(c) (1988); 50 C.F.R. Sec. 17.11(h) (1993). (After oral argument, the U.S. Fish and Wildlife Service proposed to reclassify the bald eagle from "endangered" to "threatened" in most states, 59 Fed.Reg. 35,584 (1994) (to be codified at 50 C.F.R. pt. 17); adoption of this proposal would not affect our analysis).
 
 
 4
 On August 22, 1991, Union Pacific sought permission to abandon the Wallace Branch under 49 U.S.C. Sec. 10903 (1988), which allows abandonment "if the Commission finds that the present or future public convenience and necessity require or permit" it. Id. Sec. 10903(a). The Wallace Branch serves five shippers, and train service is provided once a week. In its abandonment application, Union Pacific claimed that the revenues generated by this traffic were insufficient to cover operating and maintenance expenses. It also asserted that "significant opportunity costs are being incurred because of operation over the line." Abandonment Application, Joint Appendix ("J.A.") at 84. One of the opportunity costs listed in the application was the annualized cost of the capital tied up in the line.
 
 
 5
 Several parties, including the Coeur d'Alene Tribe, some affected shippers, the State of Idaho (actually the Idaho Public Utilities Commission, which appeared before the Commission, as it does here, on behalf of the State), and several of its elected officials, filed comments with the Commission on the abandonment application. Most of the comments raised economic and environmental objections. For example, the State and the shippers charged that Union Pacific had understated the profitability of the Wallace Branch. In addition, the State and the Coeur d'Alene Tribe claimed that the soil along the Branch's right-of-way is polluted with metal concentrates that have leaked over the years from passing railroad cars; they asserted that disturbance of the polluted rail bed during any salvage activities by Union Pacific could release metal contaminants into the air and water. While not opposing abandonment, the Tribe urged the Commission to require Union Pacific to clean up this alleged pollution.
 
 
 6
 In a 3-2 decision, the Commission approved Union Pacific's application, finding that abandonment of the Wallace Branch was consistent with the "public convenience and necessity" under 49 U.S.C. Sec. 10903. Union Pacific R.R. Co.--Abandonment--Wallace Branch, ID, 9 I.C.C.2d 325, 359 (1992). Assessing economic considerations, the Commission found that Union Pacific would incur a loss of $121,767 if forced to continue service during the upcoming year. Id. at 350. It also made several findings not challenged here. Id. at 350-59.
 
 
 7
 The Commission began its discussion of the potential environmental consequences of permitting Union Pacific to engage in salvage activities as follows:
 
 
 8
 We share the parties' concern that [metal] concentrates may pose a serious threat to human health and safety, whether left in place or disturbed. However, [the Environmental Protection Agency] and/or [the Idaho Division of Environmental Quality] have the appropriate jurisdiction and responsibility for developing and implementing remediation plans for sites where hazardous materials are present, including (1) determining the extent of contamination, (2) developing risk assessments and (3) determining the need for any monitoring and decontamination plans.
 
 
 9
 Id. at 337. Noting that "we cannot predict whether--or when--salvage activity will take place on this line" because the costs to Union Pacific of cleaning the track might outweigh the benefits of salvaging it, id. at 338 n. 19, the Commission imposed the following six conditions "to ensure adequate protection of the environment if salvage operations ultimately are undertaken":
 
 
 10
 1. [Union Pacific] shall not salvage any railroad infrastructure, including the rails and ties, along the entire right-of-way until it has consulted with the Idaho Department [sic] of Environmental Quality and the U.S. Environmental Protection Agency. This consultation will ensure that if and when salvage activity ultimately takes place it will be in compliance with the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. [Secs.] 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Sec. [Sec.] 6901 et seq. and/or other applicable laws and regulations.
 
 
 11
 2. Pursuant to the U.S. Fish and Wildlife Service's request, [Union Pacific], prior to any salvage activity, shall determine, using National Wetland Inventory Maps, if wetlands are located along the right-of-way. If wetlands are located along the right-of-way, [Union Pacific] shall consult with the USFWS prior to any disturbance of the right-of-way and comply with any applicable requirement of the U.S. Fish and Wildlife Coordination Act, 16 U.S.C. Sec. 661.
 
 
 12
 3. [Union Pacific] shall not undertake any salvage activities on the Wallace Branch until compliance with Sec. 7 of the Endangered Species Act of 1973, 16 U.S.C. Sec. 1531, has been completed. As a part of the Sec. 7 compliance process, [Union Pacific] shall retain an independent biological consultant, to work under [the supervision of the Commission's Section of Energy and Environment] and in cooperation with USFWS, to prepare a biological assessment.4. A Water Pollution Control Act permit under 35 U.S.C. Sec. 1251 et seq., may be required prior to salvage of the portion of the Wallace Branch where it crosses the Coeur d'Alene River. Prior to any salvage activities, [Union Pacific] shall contact the Idaho Department of Water Resources to determine if such a permit is required and take the necessary steps to secure a permit.
 
 
 13
 5. The U.S. Army Corps of Engineers (CORPS) has expressed concerns regarding impacts to wetlands and water quality if [Union Pacific] salvages the right-of-way. In addition, the CORPS has indicated that materials in the area through which the track passes should be tested prior to any attempt to remove it. Accordingly, [Union Pacific] shall consult with the CORPS prior to undertaking any salvage activities to determine what appropriate mitigation may be required.
 
 
 14
 6. [Union Pacific] shall retain its interest in and take no steps to alter the historic integrity of all structures, including the line itself, that are 50 years old or older until completion of the Sec. 106 process of the National Historic Preservation Act, 16 U.S.C. Sec. 470f.
 
 
 15
 Id. at 339. The Commission found that "with the above-mentioned protective conditions, this abandonment proposal will not significantly affect the quality of the human environment." Id. It thus declined to prepare an Environmental Impact Statement ("EIS"). Id. at 340; see 42 U.S.C. Sec. 4332(2)(C) (1988) (EIS must be prepared for "major Federal actions significantly affecting the quality of the human environment").
 
 
 16
 In a biting dissent, two commissioners contended, inter alia, that the Commission could not rule on the abandonment application without preparing an EIS, and that, in any event, abandonment was not warranted because the Wallace Branch was actually marginally profitable. 9 I.C.C.2d at 360-65.
 
 II. DISCUSSION
 
 17
 Petitioners claim that the Commission's decision to allow Union Pacific to discontinue service on the Wallace Branch violates the Interstate Commerce Act. They also challenge the decision regarding salvage activities, arguing that the Commission should have prepared an Environmental Impact Statement and a Biological Assessment in accordance with, respectively, the National Environmental Policy Act and the Endangered Species Act. We first consider their standing to raise these claims.
 
 A. Standing
 
 18
 Although the Commission attacks petitioners' standing only with respect to the Endangered Species Act claim, we have an independent obligation to assess their standing with respect to the other claims as well. See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines") (internal quotation marks and brackets omitted). In fulfilling that obligation, we are mindful that "standing ... must affirmatively appear in the record" and that "it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." Id. (internal quotation marks and citation omitted).
 
 
 19
 "[T]he irreducible constitutional minimum of standing contains three elements": (1) injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor. Lujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Beyond this constitutional minimum, those invoking federal court jurisdiction must satisfy various "prudential standing" requirements. See 13 C. Wright & A. Miller, Federal Practice and Procedure Sec. 3531.7 at 507. The main prudential hurdle faced by petitioners in this case is to show that they fall within the "zone of interests" protected by the statutes on which their claims rest. See Water Transport Ass'n v. ICC, 819 F.2d 1189, 1194-95 (D.C.Cir.1987) (applying the zone-of-interest test in a petition for review of a Commission order). Under the zone-of-interest test, "[t]he essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law." Clarke v. Securities Industry Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987) (internal quotation marks and brackets omitted). "The test is not meant to be especially demanding." Id. (footnote omitted).
 
 
 20
 Applying these principles, we think petitioners plainly have standing to challenge the Commission's authorization to discontinue service. The three mining companies have suffered concrete injury as a result of this authorization for they will have to find an alternative means of shipping their products. In addition, these companies fall squarely within the zone of interests protected by 49 U.S.C. Sec. 10903, the Interstate Commerce Act provision that empowers the Commission to oversee rail abandonments. See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981) (Commission must consider "the interests of those now served by the present line" when passing on abandonment applications). Because the shippers have standing to challenge the discontinuance of service, we need not decide whether the State also does. Railway Labor Executives' Ass'n v. United States, 987 F.2d 806, 810 (D.C.Cir.1993) ("[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case.").
 
 
 21
 We also conclude that petitioners have standing to challenge the Commission's conditional authorization of salvage activities. The record shows that the Wallace Branch passes through land owned by the State of Idaho (including Heyburn State Park and portions of the Coeur d'Alene River Wildlife Management Area), and the State has alleged that any salvage activities by Union Pacific will pollute the areas surrounding the Branch. Like any private landowner, a State suffers concrete injury if its property is despoiled. See Goos v. ICC, 911 F.2d 1283, 1290 (8th Cir.1990) (noting that "we have held in several cases that persons who own property in, or merely reside near, an area threatened by environmental injury have an interest sufficient to support standing," and citing cases); see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 601, 102 S.Ct. 3260, 3266, 73 L.Ed.2d 995 (1982) ("[L]ike other associations and private parties, a State is bound to have a variety of proprietary interests.... As a proprietor, it is likely to have the same interests as other similarly situated proprietors."). Further, the Supreme Court has made clear that neither the causation requirement nor the redressability requirement for constitutional standing should hinder enforcement of "procedural rights," such as the right to require an agency to prepare an environmental impact statement or a biological assessment:
 
 
 22
 There is much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case-law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an Environmental Impact Statement, even though he cannot establish with any certainty that the Statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.
 
 
 23
 Lujan, --- U.S. at ---- - ---- n. 7, 112 S.Ct. at 2142-43 n. 7. Accordingly, we conclude that the State has constitutional standing to challenge the Commission's conditional authorization of salvage activities and thus do not consider that of the shippers. See Railway Labor Executives' Ass'n, 987 F.2d at 810.
 
 
 24
 Of course, the environmental injury asserted by the State falls squarely within the zone of interests protected by the National Environmental Policy Act ("NEPA"). Gifford-Hill & Co., Inc. v. FTC, 523 F.2d 730, 732 (D.C.Cir.1975) ("NEPA's concern is with protection of the environment"). Thus, the State can clearly assert the NEPA claim. The harder question is whether the State has prudential standing to assert the Endangered Species Act ("ESA") claim. We conclude that it does because of Idaho's proprietary interest in the land around the Wallace Branch. See Snapp, 458 U.S. at 601, 102 S.Ct. at 3265-66 (in addition to quasi-sovereign interests, "the interests that a State may pursue" in court include "proprietary interests" and "sovereign interests").
 
 
 25
 The record shows that the State owns over 80 percent of the Coeur d'Alene River Wildlife Management Area, where "upwards of 20 [bald] eagles have been sighted." Environmental Comments of the State of Idaho by and through the Idaho Public Utilities Commission, J.A. at 153. "The primary objective[ ] of the [Wildlife Management Area] is to manage water fowl [sic] production and hunting as well as fishing resources." Id. We think the State's decision to dedicate its land to this objective makes it "a reliable [party] to litigate the issues of the public interest in this case," Clarke, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12 (internal quotation marks omitted); unlike a landowner whose pecuniary interests happen to line up with environmental aims in a particular case, Idaho has coupled its property interest to the goal of wildlife protection in an enduring manner. Furthermore, the ESA specifically authorizes a State to bring an action to enforce its provisions. Section 1540(g) states, in pertinent part, that "any person may commence a civil action on his own behalf ... to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof...." 16 U.S.C. Sec. 1540(g)(1)(A) (1988). The ESA defines "person" to include "any State." Id. Sec. 1532(13). Taken together with this authority to sue, we conclude that the State's property interest in the Wildlife Management Area brings it within the ESA's zone of interests.
 
 
 26
 As we are satisfied that petitioners have standing and we have jurisdiction, we turn to the merits.
 
 
 27
 B. Discontinuance of Service: The Interstate Commerce Act
 
 
 28
 We consider first whether the Commission complied with the Interstate Commerce Act in allowing Union Pacific to discontinue service on the Wallace Branch. The Act provides in pertinent part:
 
 
 29
 (a) A rail carrier ... may--
 
 
 30
 (1) abandon any part of its railroad lines; or
 
 
 31
 (2) discontinue the operation of all rail transportation over any part of its railroad lines;
 
 
 32
 only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance....
 
 
 33
 (b)(1) ... if the Commission--
 
 
 34
 (A) finds public convenience and necessity, it shall--
 
 
 35
 (i) approve the application as filed; or
 
 
 36
 (ii) approve the application with modifications and require compliance with conditions that the Commission finds are required by public convenience and necessity....
 
 
 37
 49 U.S.C. Sec. 10903. In determining the "public convenience and necessity," "the Commission must balance the interests of those now served by the present line on the one hand, and the interests of the carrier and the transportation system on the other." Chicago & N.W. Transp. Co., 450 U.S. at 321, 101 S.Ct. at 1132. To strike this balance,
 
 
 38
 the Commission weighs such items as costs which might be avoided if abandonment is allowed ("avoidable costs"), the costs of tying up investment ("opportunity costs"), profitability, the condition of the line, and future impact on shippers and adjacent communities.
 
 
 39
 Association of Am. R.Rs. v. ICC, 846 F.2d 1465, 1467 (D.C.Cir.1988). Once the balance is struck, the Commission's reading of the scale is entitled to considerable deference. Chicago & N.W. Transp. Co., 450 U.S. at 321, 101 S.Ct. at 1132. "Indeed, so long as the ICC engaged in reasoned decisionmaking, and the decision is adequately explained and supported by the record, we will sustain the decision." Consolidated Rail Corp. v. ICC, 29 F.3d 706, 710 (D.C.Cir.1994).
 
 
 40
 Petitioners charge that the Commission erred by underestimating the profitability of the Wallace Branch in several ways. First, they assert that the Commission should have counted the revenues Union Pacific was projected to receive after the upcoming year from Green Cosmos Corporation, a start-up lumber company served by the Wallace Branch. They rely on Illinois Commerce Comm'n v. ICC, 776 F.2d 355 (D.C.Cir.1985), where we permitted the Commission to treat labor costs as "avoidable costs" even though the carrier had to compensate displaced workers for a few years following the abandonment. Id. at 360. In Illinois Commerce, we noted that
 
 
 41
 [t]he costs that must be taken into account for purposes of evaluating the burden on the railroad are not only those costs that can be avoided at once (the year after abandonment), but also those that will be saved (so to speak) down the line.... [I]t is preposterous to think that a line must be kept perpetually in service ... simply because the millions of dollars in savings will accrue only in the second or third or fifth year after abandonment. The standard of "present or future public convenience and necessity" serves to avoid just such an absurdity.
 
 
 42
 Id. at 359 (quoting 49 U.S.C. Sec. 10903; emphasis in original).
 
 
 43
 The Commission later reaffirmed this future-oriented approach by adopting an abandonment regulation requiring that revenues and avoidable costs be projected for a "forecast year"--the 12-month period beginning with the month the abandonment application is filed. Abandonment Regulations--Costing (Implementation of the Railroad Accounting Principles Board Findings), 5 I.C.C.2d 123, 127, 130 (1988). In addition, the Commission recognized that "all avoidable costs should be factored into the abandonment decision, even though some of those costs may not be avoided until well into the future" and required "that applicants provide the Commission with a multiple year forecast of operating results in those situations where significant costs will not be avoided until well after the close of the Forecast Year." Id. at 127 n. 16.
 
 
 44
 We agree with petitioners that in failing to fully account for the expected revenues from Green Cosmos's woodchip shipments, the Commission departed from these forward-looking principles, which surely apply to revenues as well as costs. The Commission reduced Green Cosmos's annual projection of 156 cars of woodchips to 139 cars because even though "Green Cosmos' projections do not appear unreasonable[,] ... Green Cosmos only began shipping woodchip traffic in late November, after [part] of the forecast year had already expired." Union Pacific R.R. Co.--Abandonment, 9 I.C.C.2d at 343. Contrary to the statute and its own pledge to incorporate financial data that become available "well into the future," the Commission treated the forecast year as a straitjacket, ignoring revenues projected to accrue after the 12-month cut-off date. Thus, the revenue attributable to woodchip shipments by Green Cosmos should be adjusted upward by an amount equivalent to the freight charge for 17 carloads.
 
 
 45
 Even if we accept petitioners' projections, however, this amount turns out to be only $24,286 (petitioners' full-year projection of $222,855 minus the Commission's figure of $198,569), which still leaves Union Pacific with an avoidable loss of $97,481 (Commission's loss calculation of $121,767 minus $24,286). See id. at 342-43, 350. Thus, the Commission's error here was harmless.
 
 
 46
 While it should have accepted Green Cosmos's projection for woodchip shipments after the forecast year, the Commission properly rejected a similar projection for lumber shipments. The Commission found the latter figure "too speculative" and "not adequately supported" because Green Cosmos would have had to divert a creek and make other structural changes at its saw mill before it could sustain the projected level of shipments. Id. at 344. As the Commission's duty to consider revenues beyond the forecast year does not require it to accept speculation, this finding seems well within the Commission's broad discretion.
 
 
 47
 Next, petitioners argue that the Commission overstated Union Pacific's "avoidable costs" by counting the cost of maintaining a customer services station at Kellogg, Idaho. According to petitioners, the Kellogg station is no longer needed for efficient operation of the Wallace Branch. See 49 C.F.R. Sec. 1152.32 (1993) ("The avoidable costs of providing freight service on a branch shall be just and reasonable, and shall not exceed those necessary for an honest and efficient operation."). But Union Pacific cannot close the Kellogg station without permission from the Idaho Public Utilities Commission ("IPUC"), which denied this permission in 1988 due to the opposition of area shippers.
 
 
 48
 Petitioners point out that in the instant proceeding, representatives of each shipper testified that they would now support closing the Kellogg station if it meant continued service on the Wallace Branch. The crucial testimony, however, came from the President of the IPUC, who refused to guarantee that her agency would grant a request to close the station. See J.A. Errata at 433-34. In light of her testimony, we cannot fault the Commission for refusing to "speculate on whether or when [Union Pacific] would again request to close the station, whether the state agency would grant the request, or when such an order might become effective." Union Pacific R.R. Co.--Abandonment, 9 I.C.C.2d at 347.
 
 
 49
 After oral argument, petitioners notified us for the first time that the IPUC had in fact approved Union Pacific's request to close the Kellogg station on November 12, 1992. The IPUC's decision apparently came as news to the Commission. Despite having ample time to submit the IPUC decision to the Commission before the latter denied appeals on December 2, 1992, and denied a stay on March 11, 1993, petitioners never did so. Under these circumstances, we hold that petitioners have waived any right to rely on the November 12, 1992, decision of the IPUC, which we deem a factual development that should have been brought to the agency's attention. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (carrier waived issue by failing to raise it before Commission: "Orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."); Wilson & Co., Inc. v. United States, 335 F.2d 788, 799 (7th Cir.1964) (refusing to consider testimony not introduced in Federal Communications Commission proceeding: "A judicial review of an administrative order must be based solely upon the record made before the agency."), remanded on other grounds, 382 U.S. 454, 86 S.Ct. 643, 15 L.Ed.2d 523 (1966).
 
 
 50
 Finally, petitioners argue that the Commission miscalculated the opportunity cost of continued service on the Wallace Branch. As the Commission noted, "[o]pportunity costs reflect the economic loss experienced by a carrier from forgoing a more profitable alternative use of its assets." Union Pacific R.R. Co.--Abandonment, 9 I.C.C.2d at 349. In this case, the Commission set the opportunity cost at zero, but petitioners claim that it is actually negative due to steep environmental cleanup costs that Union Pacific will incur.
 
 
 51
 As the Commission pointed out, "mandating the cleanup of the contamination could occur whether or not the line was abandoned." Id. at 350 n. 29. If the likelihood of a cleanup being ordered does not depend on the abandonment decision, cleanup costs should not affect the opportunity cost calculation. Under this assumption, the true opportunity cost is neither zero nor negative; instead, it equals at least the salvage value of the rail materials. Thus, if cleanup costs are independent of abandonment, the Commission erred in fixing the opportunity cost at zero; but this error was harmless because a positive opportunity cost would simply raise the total economic benefit of abandonment and thus further tip the balance in favor of that result.
 
 
 52
 On the other hand, if cleanup is required only in the event of salvage, the Commission did not err. By fixing the opportunity cost at zero, the Commission captured the reality that Union Pacific would likely forgo salvage activities (and the opportunity to profit from them) if cleanup costs exceeded salvage revenues: "As a practical matter, a carrier would not be expected to salvage the rail materials if the cost of cleaning them exceeded the revenues from their sale." Id.
 
 
 53
 In either event, the Commission's treatment of the opportunity cost did not prejudice petitioners.
 
 C. Salvage Activity: NEPA and the ESA
 
 54
 Petitioners claim that the Commission's decision to authorize Union Pacific to salvage rail materials violates NEPA and the ESA. We address these claims in turn.
 
 1. National Environmental Policy Act
 
 55
 NEPA requires federal agencies to include an EIS "in every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C) (1988). In this case, the Commission declined to prepare an EIS because it concluded that "with the [six] protective conditions, this abandonment proposal will not significantly affect the quality of the human environment." Union Pacific R.R. Co.--Abandonment, 9 I.C.C.2d at 339. In reviewing the Commission's failure to prepare an EIS, we consider four criteria:
 
 
 56
 (1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.
 
 
 57
 Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 682 (D.C.Cir.1982). Because the Commission failed to meet the first of these criteria, we do not reach the other three.
 
 
 58
 Nowhere in the Commission's decision does one find a "hard look" at the potential environmental impacts of salvage. Although the Commission professed to "share the parties' concern" that salvage activities might harm the environment, it neither analyzed the potential harm nor weighed it against the economic benefits of abandonment. 9 I.C.C.2d at 337-38; see Illinois Commerce Comm'n v. ICC, 848 F.2d 1246, 1259 (D.C.Cir.1988) (record of abandonment authorization must reflect "hard look at environmental factors" and judgment that "the public benefits flowing from the actions outweighed their environmental costs" (internal quotation marks omitted)). Instead of taking its own hard look, the Commission deferred to the scrutiny of others by authorizing salvage subject to conditions that require Union Pacific to consult with various federal and state agencies about the specific environmental impacts that fall within their jurisdictions.
 
 
 59
 An agency cannot delegate its NEPA responsibilities in this manner, as our decision in Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n, 449 F.2d 1109 (D.C.Cir.1971), makes clear. In that case, we struck down procedural rules adopted by the Atomic Energy Commission to govern its consideration of environmental issues in reviewing license applications. Under one of these rules, " 'proof that the [license] applicant is equipped to observe and agrees to observe' " environmental standards set by other state and federal agencies " '[would] be considered a satisfactory showing that there will not be a significant, adverse effect on the environment.' " Id. at 1122 (quoting 10 C.F.R. Sec. 50, App. D at 249 (1971)). We found this attempt to rely entirely on the environmental judgments of other agencies "in fundamental conflict with the basic purpose of [NEPA]":
 
 
 60
 NEPA mandates a case-by-case balancing judgment on the part of federal agencies. In each individual case, the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental costs; alternatives must be considered which would affect the balance of values.... The point of the individualized balancing analysis is to ensure that, with possible alterations, the optimally beneficial action is finally taken.
 
 
 61
 Certification by another agency that its own environmental standards are satisfied involves an entirely different kind of judgment. Such agencies, without overall responsibility for the particular federal action in question, attend only to one aspect of the problem.... Certifying agencies do not attempt to weigh [environmental] damage against the opposing benefits. Thus the balancing analysis remains to be done.
 
 
 62
 Id. at 1123; see also North Carolina v. FAA, 957 F.2d 1125, 1129 (4th Cir.1992) (agency does not satisfy NEPA "by simply relying on another agency's conclusions about a federal action's impact on the environment").
 
 
 63
 The Commission's order constitutes a more blatant departure from NEPA than the rule we struck down in Calvert Cliffs' because the Commission has deferred not only to the judgments of other agencies, but also to that of Union Pacific, the licensee. Except for the condition requiring compliance with the Endangered Species Act, which we discuss below, the conditions imposed by the Commission require only that Union Pacific consult with various agencies about the impacts of salvage; thus, only Union Pacific will be in a position to assess the total environmental impact of salvage activities and perform an "individualized balancing analysis." We have held that NEPA prohibits such an abdication of regulatory responsibility in favor of the regulated party. Illinois Commerce Comm'n, 848 F.2d at 1258 ("The Commission may not delegate to parties and intervenors its own responsibility to independently investigate and assess the environmental impact of the proposal before it." (citing, inter alia, Calvert Cliffs' )).
 
 
 64
 The Commission contends that because it retains jurisdiction to monitor compliance with the six conditions, it will be able to conduct any further environmental analysis that may be necessary if and when Union Pacific chooses to salvage. We doubt, however, that a proceeding to enforce a particular condition would provide an opportunity for the comprehensive environmental review mandated by Calvert Cliffs'; indeed, the Commission conceded at oral argument that it contemplated no further public comment on the environmental aspects of salvage. Piecemeal enforcement of license conditions is no substitute for an overarching examination of environmental problems at the time the licensing decision is made.
 
 
 65
 Department of the Interior v. FERC, 952 F.2d 538 (D.C.Cir.1992), on which the Commission leans, is not to the contrary. Interior held only that the Federal Energy Regulatory Commission properly approved hydroelectric licenses subject to conditions that enabled it to protect against unknown risks of fish mortality. Id. at 547. FERC fashioned these conditions to deal with unresolved technical issues only after it had engaged in a full-scale environmental analysis. Id. at 541-42, 545-46. Here, by contrast, the Commission has imposed conditions in lieu of undertaking such an analysis.
 
 
 66
 Without the requisite hard look, we cannot determine whether the Commission "made a convincing case that the impact was insignificant" or "whether [it] convincingly established that changes in the project" minimized any impact. See Cabinet Mountains Wilderness, 685 F.2d at 682. We therefore remand the conditional salvage authorization so that the Commission may comply with NEPA.
 
 2. Endangered Species Act
 
 67
 Section 7 of the ESA requires federal agencies to
 
 
 68
 insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical....
 
 
 69
 16 U.S.C. Sec. 1536(a)(2) (1988). To carry out this duty, each agency must, "with respect to any agency action," ask the Secretary of the Interior whether any "species which is listed or proposed to be listed" as endangered or threatened is present in the area of the proposed action. Id. Sec. 1536(c)(1). If the Secretary advises that such species may be present, the agency must
 
 
 70
 conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action.
 
 
 71
 Id.
 
 
 72
 If the agency determines that the action will "affect listed species or critical habitat," then it must consult formally with the Director of the U.S. Fish and Wildlife Service or the National Marine Fisheries Service. 50 C.F.R. Secs. 402.14(a), 402.01(b) (1993); see also id. Sec. 402.12(k) (1993). The Director must then prepare a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." Id. Sec. 402.14(g)(4) (1993). "If jeopardy or adverse modification is found, the Secretary [of Interior] shall suggest those reasonable and prudent alternatives which he believes would not violate [16 U.S.C. Sec. 1536(a)(2) ] and can be taken by the Federal agency or applicant in implementing the agency action." 16 U.S.C. Sec. 1536(b)(3)(A).
 
 
 73
 The agency may delegate its duty to prepare a biological assessment to private parties as long as it supervises the process:
 
 
 74
 Any person ... may prepare a biological assessment under the supervision of the Federal agency and in cooperation with the [U.S. Fish and Wildlife or the National Marine Fisheries] Service consistent with the procedures and requirements of this section.
 
 
 75
 50 C.F.R. Sec. 402.12(b) (1993). Here, the Commission exercised this option by instructing as follows in the third of its six environmental conditions:
 
 
 76
 [Union Pacific] shall not undertake any salvage activities on the Wallace Branch until compliance with Sec. 7 of the Endangered Species Act ... has been completed. As a part of the Sec. 7 compliance process, [Union Pacific] shall retain an independent biological consultant, to work under [the Commission's] supervision and in cooperation with [the U.S. Fish and Wildlife Service], to prepare a biological assessment.
 
 
 77
 Union Pacific R.R. Co.--Abandonment, 9 I.C.C.2d at 339.
 
 
 78
 Petitioners do not object to the delegation of responsibility for conducting the biological assessment. They argue, however, that the Commission has failed to comply with its obligations under the ESA, which, in their view, required preparation of an assessment within 180 days after the Commission received and concurred with the species list. In support of this argument, they point to an ESA regulation providing that "[t]he Federal agency ... shall complete the biological assessment within 180 days after its initiation (receipt of or concurrence with the species list) unless a different period of time is agreed to...." 50 C.F.R. Sec. 402.12(i) (1993) (emphasis added).
 
 
 79
 We agree that the Commission violated the regulation. On August 22, 1991, Union Pacific received a list of the two endangered or threatened species that may inhabit the area surrounding the Wallace Branch--the bald eagle and the gray wolf; the Commission's duty to supervise Union Pacific put the agency on constructive notice of the items in this list; and on September 27, 1991, the Commission's environmental staff acknowledged the possible presence of these two species. These events would seem to qualify as "receipt of" and "concurrence with" the species list, but 180 days have long since elapsed and no biological assessment has been prepared.
 
 
 80
 We believe, however, that the violation of the 180-day limit harmed no interest of the petitioners, if indeed such a violation could ever harm an interest of parties opposing an application for a license or permit. Nor has it frustrated any of the apparent purposes of this and related provisions of the ESA and its implementing regulations. One of these is to protect license applicants from bureaucratic delay. Both the statute and the regulation bar extensions of the 180-day deadline in cases involving license applicants unless the agency provides the applicant with a written statement "setting forth the estimated length of the proposed extension and the reasons therefor." 16 U.S.C. Sec. 1536(c); see also 50 C.F.R. Sec. 402.12(i). The deadline also ensures the expeditious completion of the assessment, which complements ESA's requirement that this be accomplished "before any contract for construction is entered into and before construction is begun." 16 U.S.C. Sec. 1536(c); see also 50 C.F.R. Sec. 402.09 (1993) (barring "irreversible or irretrievable commitment of resources" until "the requirements of [16 U.S.C. Sec. 1536(a)(2) ] are satisfied"). Finally, the regulations reflect a concern that the agency act on the basis of up-to-date information regarding threatened and endangered species. See 50 C.F.R. Sec. 402.12(e) ("If the Federal agency or the designated non-Federal representative does not begin preparation of the biological assessment within 90 days of receipt of (or concurrence with) the species list, [it] must verify ... with the Service the current accuracy of the species list at the time the preparation of the assessment is begun.").
 
 
 81
 Union Pacific's false start has not compromised any of these goals. The failure to complete the assessment within 180 days was due not to tardigrade bureaucrats, but to its own failure to decide whether it wanted to proceed with salvage operations. As no such work was in progress, there was no need to ensure the expeditious completion of a biological assessment before an "irreversible or irretrievable commitment of resources" was made. And if and when Union Pacific does decide that it wishes to salvage the rail and other materials along its right-of-way and proceeds with a biological assessment in accordance with the regulations, the Commission will have current information in hand with which to undertake its "systematic determination of the effects of [the activity] on endangered species." Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir.1985).
 
 
 82
 We believe it important to note that the Commission has still not given final approval to salvage operations; it has merely set forth the conditions under which Union Pacific may undertake them if it chooses to do so. As the Commission explained at oral argument,
 
 
 83
 [o]ur interpretation [of the third condition] is ... that [Union Pacific] has to hire an independent biological consultant and work under our environmental staff's supervision and cooperation, [to] prepare a biological assessment. Now when that biological assessment is completed, under section 7 [of the ESA] the U.S. Fish and Wildlife Service would issue a biological opinion, and at that point ..., they would come back to the Commission, and the Commission would decide what to do based on the findings of the biological assessment and the biological opinion.
 
 
 84
 Tape of Oral Argument, May 20, 1994, Case No. 93-1015. The Commission's construction, of course, recognizes that compliance with section 7 of the ESA requires that the agency itself ultimately determine the likely impact of salvage operations on the listed species. 16 U.S.C. Sec. 1536(a)(2).
 
 D. Claims of Coeur d'Alene Tribe
 
 85
 The Coeur d'Alene Tribe launches several attacks against the Commission's decision, all of which miss the mark. Claiming a reversionary interest in the right-of-way, the Tribe argues that the Commission's order effects an unconstitutional taking of that interest because it allows the Commission to retain jurisdiction over the Wallace Branch indefinitely while Union Pacific decides whether to salvage. We decline to address this issue, however, because the Tribe failed to raise it before the Commission. United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (carrier waived issue by failing to raise it before Commission).
 
 
 86
 The gist of the Tribe's other arguments is that the Commission should have required Union Pacific to clean up the alleged pollution on the Wallace Branch. But the Tribe never explains where the Commission would have found the authority to order such affirmative relief in the course of an abandonment proceeding. The proper vehicle for this sort of relief would be a civil action against Union Pacific, and the Tribe has apparently filed such an action. See Reply Brief for Commission at 6 n. 5 (citing Coeur d'Alene Tribe v. Gulf Resources & Chemical Corp. et al., Civ-91-0342-N-HLR (D.Idaho)).
 
 III. CONCLUSION
 
 87
 We affirm the portion of the Commission's order granting Union Pacific's request to discontinue service on the Wallace Branch, and we remand the portion conditionally authorizing salvage activities so that the Commission may comply with the National Environmental Policy Act.
 
 
 88
 So ordered.