**SOUTHERN UTAH WILDERNESS ALLIANCE, et al., Plaintiffs,**

v.

**Gale NORTON, Secretary, Department of the Interior, et al., Defendants,**

**Utah School and Institutional Trust Lands Administration, et al., Intervenor–Defendants.**

**No. CIV.A.02–1868 JR.**

United States District Court, District of Columbia.

Dec. 23, 2002.

**50**

Stephen H.M. Bloch, Heidi J. McIntosh, Southern Utah Wilderness Alliance, Salt Lake City, UT, Katherine A. Meyer, Meyer & Glitzenstein, Sharon Buccino, Natural Resources Defense Council, Washington, DC, for plaintiffs.

Donna S. Fitzgerald, U.S. Department of Justice, Washington, DC, for defendants.

J. Mark Ward, Utah Attorney Generals Office, Salt Lake City, UT, for defendants-intervenors.

### MEMORANDUM

ROBERTSON, District Judge.

Plaintiffs are a group of environmental organizations that challenge a decision of the Interior Board of Land Appeals (IBLA) upholding the Bureau of Land Management's (BLM) approval of a seismic and oil gas exploration project in Grand County, Utah. Plaintiffs contend that BLM failed to take a "hard look" at the environmental impact of the project and to adequately consider alternative plans, in violation of the National Environmental Policy Act (NEPA), and that IBLA's exclusion of certain evidence from the administrative record was arbitrary and capricious under the Administrative Procedure Act (APA).

For the reasons set forth below, plaintiffs' motion for summary judgment will be granted and defendants' and intervenor's motions for summary judgment will be denied.

### Background

On August 24, 2001, WesternGeco filed a Notice of Intent to conduct a two-dimensional ("2D") seismic exploration of an area in Grand County, Utah (northeast of Moab, Utah) on behalf of its client Eclipse

Exploration,[1] to determine the extent of oil and gas reserves and the appropriateness of future exploratory drilling. The proposed project, called "Yellow Cat Swath," covers approximately 23,040 acres of private, state, and federal lands, on which seven source lines were laid out for the collection of seismic data. Trucks (defendants call them "buggies") were to traverse three of the source lines for a total of 18.3 miles. The trucks would vibrate the ground with steel pads at 144 points on each source line to conduct the necessary "vibroseis" data. Administrative Record (AR) 12, 166, 170.

On December 12, 2001, BLM issued a draft Environmental Assessment (EA) pursuant to NEPA, opening a 30–day comment period that was later extended to January 22, 2002. AR 1542. On January 31, 2001, after receiving comments from the Fish and Wildlife Service, Environmental Protection Agency, U.S. Geological Service, National Park Service, Utah Department of Natural Resources, and members of the public, BLM issued the final EA with the Decision Record and Finding of No Significant Impact (FONSI), concluding that there would be no significant impact on the environment and that no Environmental Impact Statement (EIS) was required under NEPA. BLM attached "special conditions" (otherwise known as mitigation conditions) to its finding, among them that operations would be halted when the soil was wet and that soil ruts in excess of four inches would be avoided. AR 159–163. With this approval by BLM, the project commenced on or around February 15, 2002. AR 14.

Plaintiffs immediately filed an appeal challenging the Decision Record consisting of the EA/FONSI to the Interior Board of Land Appeals (IBLA) and IBLA granted an interim stay. AR 14. Project activity was stopped on February 22, 2002, with one half of it having been completed. AR 14. On February 23, 2002, the Director of the Office of Hearings and Appeals vacated the interim stay but issued a permanent stay of the Decision Record, remanding the appeal to IBLA for a decision on the merits of the appeal. On August 22, 2002, IBLA affirmed the EA/FONSI by a 2–to–1 decision. AR 10. Plaintiffs filed this suit on September 23, 2002. The parties agreed not to resume project activity until the Court ruled on plaintiffs' motion for a preliminary injunction. That motion was granted on October 30, 2002,[2] and an expedited schedule was established for briefing and deciding the motions that are now before the Court.

### Analysis

Plaintiffs assert three grounds for finding that defendants' actions violated NEPA and the APA: (1) that BLM failed to adequately consider alternative plans, required by 42 U.S.C. § 4332(E) and 40 C.F.R. § 1508.9, such as limiting exploration to existing trails or using the shothole method instead of vibroseis; (2) that IBLA ignored evidence in the administrative record demonstrating that WesternGeco had violated the special conditions attached to the FONSI and had moreover, used tire chains that were not mentioned in the Environmental Assessment; and (3) that BLM failed to take a "hard look" at the project's environmental impact on biological soil crust, visual resources (scenic quality of the area), and endangered species,

---

1. Eclipse Exploration held federal and state oil and gas leases covering the area to be explored. WesternGeco operated the trucks.

2. On information and belief, plaintiffs state that there has been no project activity since August 22, 2002.

and did not sufficiently analyze cumulative effects.

▮ NEPA requires agencies to prepare an Environmental Impact Statement (EIS) for every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An Environmental Assessment (EA) is made to determine whether an EIS is required. 40 C.F.R. § 1508.9. If any significant environmental impact might result from the proposed agency action, an EIS must be prepared before agency action is taken. Judicial review of agency's finding of no significant impact and decision not to complete an EIS is performed according to 5 U.S.C. § 706(2)(A) of the APA. The agency's finding and decision may be overturned "only if it was arbitrary, capricious or an abuse of discretion." *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C.Cir. 1985). The reviewing court is to consider: (1) whether the agency accurately identified the relevant environmental concerns; (2) once the agency identified the problem, whether it took a 'hard look' at it in preparing the EA; (3) if a finding of no significant impact was made, whether the agency made a convincing case for its finding; and (4) if the agency identified an impact of true significance, whether the agency found that changes or safeguards in the project sufficiently reduce the impact to a minimum, which would justify not preparing an EIS. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340–41 (D.C.Cir.2002). NEPA's requirements are "essentially procedural." As long as the agency's decision is "fully informed" and "well-considered," it is entitled to judicial deference, and a court must not substitute its own policy judgment for that of the agency. *North Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C.Cir.1980).

### 1. Alternative plans were not adequately considered

▮ As part of its preparation of an EA, an agency is required to "study, develop, and describe appropriate alternatives to recommended courses of action," 42 U.S.C. § 4332(E), and to discuss alternatives that it has considered, 40 C.F.R. § 1508.9. Agency compliance *vel non* with the requirement to consider alternatives is evaluated under the "rule of reason," meaning that "the concept of alternatives must be bounded by some notion of feasibility," and that agencies are required to deal with circumstances "as they exist and are likely to exist," but are not required to consider alternatives that are "remote and speculative." *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294–95 (D.C.Cir.1988)(internal citations omitted). However, in examining alternatives to the proposed action, an agency's consideration of environmental concerns must be more than a pro formal ritual. Considering environmental costs means seriously considering alternative actions to avoid them. *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm.*, 449 F.2d 1109, 1128 (D.C.Cir.1971).

In preparing the EA in this case, BLM did discuss alternative plans (AR 169–70). What plaintiffs challenge is the sufficiency of BLM's analysis, and particularly BLM's unquestioning acceptance of the statements of WesternGeco and Eclipse Exploration, the project applicants, that limiting their operations to existing roads and trails would not meet the project objectives, AR 27 (IBLA's discussion of alternative plans focuses on George Handley's declaration that alternative plans would not meet the project goals); AR 1656 (letter from George Handley of Eclipse Exploration to Rich McClure of BLM); AR 382 (declaration of George Handley dated March 14, 2002); AR 387 (declaration of

Stuart Wright of WesternGeco dated March 2002), in the face of public comments questioning the accuracy of those statements, AR 1838–40, 1863–66. It is undisputed that BLM neither conducted nor commissioned an independent analysis of alternatives.[3]

■ An agency is obligated to take the needs and goals of the project applicant in mind when considering alternatives, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C.Cir.1991), but that obligation does not limit the scope of the agency's analysis to what the applicant says it needs. Here, the question is whether the agency had the duty to conduct an independent analysis of alternatives to running source lines across undamaged soils when at least one member of the public asserted that the use of existing roads and trails would yield acceptable data. At oral argument, counsel for the government argued that the agency was justified in relying upon the admittedly self-serving statements of the project applicants because Stuart Wright was a scientist and the commenting member of the public did not have the necessary vibroseis qualifications. Tr. of December 13, 2002 at 8. This argument, though, is not clearly supported by the record (the public commenter asserted that he had twenty years of experience with seismic mapping and that he was well acquainted with seismic equipment, terminology, and survey methods, AR 1863), and is in any event the ad hoc argument of agency counsel. *E.g.*, *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

The record before this Court gives no indication that the agency understood how (and how much) the vibroseis data would have been degraded if the trucks had been confined to existing roads and trails, or whether an alternative involving the use of *some* existing roads and trails might at least have minimized the damage. What does appear from this record is a sense that the agency (a) was in a hurry to approve the Yellow Cat Swath project and (b) considered the damage that would be done by the trucks relatively insignificant. *See, e.g.*, AR 18–20 (emphasizing existing use of the project area and that vibroseis would impact 35 acres of the 23,040 acre project area); EPA letter, AR 1678–80 (noting its receipt of the EA/FONSI on January 22, 2002—shortly before BLM issued the final EA/FONSI—and expressing concern that public was not properly notified about the details of the project); FWS letter, AR 1661–664 (conveying disappointment that BLM did not initiate early consultation and coordination with FWS).

■ It is not for this Court to say whether or not the damage already done by the vibroseis trucks, or the damage they might do in the future, is *de minimis*. If the record reflected careful consideration of the alternatives by BLM and a reasoned rejection of a requirement that existing roads and trails be used, or that some of them be used, on the grounds that data degradation would be too great and that soil damage would be *de minimis*, no judicial intervention would be warranted. But Congress has directed federal agencies "to the fullest extent possible" to "study, develop, and describe appropriate

---

**3.** At oral argument, counsel for intervenor asserted that there was no need to conduct an independent analysis of alternatives because the alternatives were not feasible, but those assertions about feasibility were based solely on the statements of WesternGeco and Eclipse Exploration.

alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). There is no *de minimis* exception to that procedural requirement. *See State of Idaho v. ICC*, 35 F.3d 585, 596 (D.C.Cir.1994)(agency failed to take a hard look at environmental impact by deferring to the judgment of other agencies and the licensee in assessing environmental impact of licensee's application); *Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1258 (D.C.Cir.1988)(agency has responsibility to independently investigate and assess environmental impact of the proposal before it).

BLM failed to adequately study, develop, and describe appropriate alternatives to recommended courses of action.

## 2. IBLA's exclusion of plaintiffs' submissions during the appeals process was arbitrary and capricious

■ IBLA's refusal to consider evidence that the trucks had made 15-inch deep ruts, not the four inches anticipated by the EA, and that they were using tire chains that nobody had mentioned in the EA approval process, is hard to understand. IBLA acknowledged that it had de novo review authority going "beyond that of the [f]ederal courts, to review information submitted on appeal to demonstrate the sufficiency of BLM's NEPA analysis and to permit that information to 'cure,' if necessary, an otherwise perceived deficiency in that analysis." AR 17. IBLA further noted that it was required to "consider all relevant information tendered both by an appellant and by BLM," and that "[t]he time frame in which the data is generated is irrelevant to appeals such as the instant one, since, until the Board acts, there is no decision for the Department." AR 17. In refusing to consider plaintiffs'

submissions (AR 47, 311, 320), IBLA offers only a one-sentence rationale—"the scope of the present appeal . . . is limited to whether or not BLM complied with the dictates of NEPA in issuance of a FONSI and approval of the Project." AR 24. The issue before IBLA, however, was whether BLM had considered all pertinent information in issuing the EA and FONSI. IBLA's rationale does not explain why it could appropriately consider declarations by the project applicant made after the EA and FONSI were issued but refuse to consider information regarding the "special conditions" (mitigation conditions) that were part of the FONSI. At the very least, in view of the fact that the project's impact on soil was one of the key areas of BLM's analysis, AR 171–73, and considering that every other detail about the mechanics of seismic exploration and vibroseis was explained, AR 166–168, IBLA should have considered BLM's and WesternGeco's failure to mention the use of tire chains.

■ The government correctly points out that NEPA does not require agencies to mitigate adverse effects and does not require a detailed explanation of the mitigation measures that will actually be employed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). There is a "fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Id.* at 353, 109 S.Ct. 1835. IBLA was not required to enforce the mitigation measures before affirming BLM's findings, but it should have considered the bearing of plaintiffs' evidence on the question of whether BLM

had adequately considered the consequences of WesternGeco's seismic exploration. Its failure to do so was arbitrary and capricious. The proof of 15–inch ruts surely tended to show that BLM had made unsupportable assumptions about the damage the trucks would cause, that BLM had not properly identified the likely effects of using these trucks to collect the required seismic data, and that BLM's hurried analysis was not the "hard look" required by law.

### Conclusion

The procedural irregularities discussed above—BLM's failure to thoroughly consider alternatives relating to existing roads and trails, and IBLA's refusal to consider evidence relevant to the validity of the EA—are a sufficient basis on which to remand this case to IBLA for further consideration. Plaintiff's remaining arguments need not be considered by this Court.

An appropriate order accompanies this memorandum.

### *ORDER*

For the reasons set forth in the accompanying memorandum, it is

**ORDERED** that plaintiffs' motion for summary judgment [# 37] is **granted** and that the motions for summary judgment of defendants [# 38] and intervenors [# 39] are **denied**. It is

**FURTHER ORDERED** that the decision of the Interior Board of Land Appeals affirming the Decision Record/Finding of No Significant Impact issued by the BLM with respect to the Yellow Cat Swath 2D Seismic Project is **declared unlawful** to the extent and for the reasons set forth in the accompanying memorandum. And it is

**FURTHER ORDERED** that this matter is **remanded** to IBLA for reconsideration in light of this ruling.