**SOUTHERN UTAH WILDERNESS ALLIANCE, et al., Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**No. 2:02–CV–01118 PGC.**

United States District Court, D. Utah, Central Division.

Aug. 22, 2003.

Heidi J. McIntosh, Stephen H.M. Bloch, Salt Lake City, UT, Susan D. Daggett, James S. Angell, Keith G. Bauerle, Denver, CO, for Plaintiffs.

Carlie Christensen, Shawn Welch, Salt Lake City, UT, L. Poe Leggette, Brett

Sumner, Washington, DC, J. Mark Ward, Salt Lake City, UT, for Defendants.

## ORDER AND OPINION

CASSELL, District Judge.

In this appeal, plaintiffs Southern Utah Wilderness Alliance, National Resources Defense Council, and The Wilderness Society (collectively "SUWA") challenge the BLM's October 4, 2002 Finding of No Significant Impact ("FONSI") and approval of Veritas DGC Land's proposal to conduct oil and gas exploration in the Uintah Basin (the "Veritas Project"). There are now three motions before the court: (1) defendant-intervenor Veritas' Motion to Supplement the Record (Doc. # 54–1); (2) the Federal Defendants'[1] Motion to Strike Extra–Record Evidence (Doc. # 69–1); and (3) SUWA's appeal of the BLM's FONSI on the Veritas Project. For the reasons explained below, the court GRANTS Veritas' Motion to Supplement, GRANTS IN PART and DENIES IN PART the Federal Defendants' Motion and DENIES SUWA's request to set aside the BLM's approval of the Veritas Project.

## Introduction

The Veritas Project covers approximately 1.9 million acres, or 3,168 square miles, but directly affects 381 acres of land.[2] This land is located in what is commonly called the "Book Cliffs" region.[3] The purpose of the Project is to "determine the potential for occurrence of oil and gas resources in the Project area and to identify areas where drilling wells would have higher probability of finding commercial quantities of hydrocarbons than if such seismic data were unavailable."[4] The Project includes conducting two-dimensional seismic exploration along 17 seismic lines totaling approximately 457 miles.[5] The Project requires the identification of several locations for the seismic lines, but requires Veritas DGC (the entity performing the exploration) to avoid areas that are "environmentally sensitive."[6] Once the intervals are identified, shot-holes of approximately 330 feet long and 60 feet deep will be drilled.[7] Travel along the seismic lines will be completed within a 10–foot wide vehicle corridor created for the Project.[8] Drilling will be achieved by a number of different methods, depending on the nature and accessibility of the terrain where the holes are to be drilled.[9] After drilling is completed, a recording crew will lay out the cable and geophones to record the seismic data.[10] The holes will then be shot consecutively and the data recorded by walking crews.[11]

In those areas affected by the Project, the BLM has developed two plans that govern land use decisions: the Book Cliffs Resource Management Plan and Environmental Impact Statement ("BCRMP") and the Diamond Mountain Resource Area Re-

---

1. The "Federal Defendants" include the following: Gale Norton, Secretary of the Department of the Interior, the United States Department of the Interior, Kathleen Clarke, the Director of the Bureau of Land Management ("BLM"), Sally Wisely, the Utah State Director of the BLM, David Howell, the Vernal Field Office Manager, and Stephen Williams, the Director of the U.S. Fish and Wildlife Service ("FWS").

2. *See* Administrative Record ("AR") at 34.

3. Plaintiff's Opening Brief on the Merits ("Plaintiff's Brief") at 1.

4. AR at 28.

5. *Id.* at 34.

6. *Id.* at 36.

7. *Id.* at 34.

8. *Id.* at 37.

9. AR at 36.

10. *Id.*

11. *Id.*

source Management Plan and Environmental Impact Statement ("DMRMP"). These plans both authorize exploration as long as certain environmental conditions are met. The record reflects that there have been previous environmental impacts on the land caused by road and oil and gas development.

On August 27, 2001, Veritas filed a Notice of Intent ("NOI") to obtain authorization to conduct oil and gas exploration in Uintah County with the BLM's Vernal Field Office ("BLM VFO").[12] After several months of analyzing the Project, allowing for public comments, and consulting with interested government agencies (such as the Fish and Wildlife Service and the Environmental Protection Agency), the BLM approved a FONSI and authorized the Veritas Project.[13] In doing so, the BLM evaluated two alternatives: the Project as proposed by Veritas and a "noaction" alternative.[14] The BLM concluded that the environmental impact of the Project would be minimal, and would "not appreciably add to the expected disturbance from previous oil and gas activities, grazing, recreation, and other uses in the area."[15]

As part of the Project's authorization, the BLM imposed several conditions designed to minimize potential impacts. For example, the BLM required vehicles to drive slowly and not use chains that would likely cause surface ruts. It further required Veritas to hand-rake any ruts that would occur from carrying out the Pro-

ject's purpose.[16] Signs of vehicle tracks must be covered within 50 feet of existing roads or trails to limit off-road or other recreational-use vehicles,[17] and shot-holes must be back-filled and plugged.[18] The BLM also specified time limits on the detonation of explosives so as not to interfere with the migration or birthing patterns of several animal species.[19] Similar mitigation measures were required to protect migratory birds and sensitive plant species indigenous to the area.[20]

Despite these precautions, SUWA alleges that the BLM's approval of the Project violated federal law by failing to fully analyze the Project's environmental impacts. As explained below, the court rejects this contention.

## I. Veritas' Motion to Supplement the Record

■ Before addressing the merits of SUWA's appeal, the court must consider Veritas' and the Federal Defendants' evidentiary motions. First, the court grants Veritas' motion to supplement the record (Doc. # 54–1) with photographs and other documents that have come into existence after the Project began. However, the court will only consider these materials to the extent that they demonstrate whether the BLM's evaluation of the remedial measures at issue was right or wrong. The Tenth Circuit has held that where "evidence comes into existence after the agency acted demonstrates the actions were right or wrong,"[21] the court may look to

12. *Id.* at 244.

13. *See id.* at 3, 158–219, 225, 227, 295, 339–340., 537–573.

14. *See id.* at 34–45.

15. AR at 223.

16. *See id.* at 81, 234, 259.

17. *See id.*

18. *See id.*

19. AR at 92, 261.

20. *Id.*

21. *Custer County Action Assoc. v. Garvey,* 256 F.3d 1024, 1028 n. 1 (10th Cir.2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1063, 151 L.Ed.2d 967 (2002).

such evidence. Here, SUWA challenges the defendants' use of allegedly speculative mitigation measures. The post-decision evidence sheds light on this issue.

In making this ruling, the court is mindful that the circumstances warranting consideration of extra-record materials are extremely limited. Moreover, the two cases cited by Veritas [22] to support its motion did *not* allow extra-record materials. However, the extra-record information at issue in those cases was of a different nature than at issue here. In those cases, the Tenth Circuit refused to allow "references in the briefs filed by industry petitioners to documents and reports not in the record," [23] outside newspaper articles, a draft of a Generic EIS for Air Force Altitude Flying Operations, and other materials.[24] This type of evidence is wholly different than the type of evidence at issue in this case: on-the-ground, physical evidence, (including photographs) that shed light on whether the BLM appropriately evaluated the mitigation measures. On this basis, the court distinguishes these cases.

The court notes that this ruling applies equally to all parties; therefore, evidence that demonstrates that the BLM acted appropriately in evaluating the remedial measures will be admitted along with evidence that it did not. At the April 9, 2003 hearing, the court invited SUWA to submit its own evidence to counter the defendants' evidence, which the court has now received and considered.

## II. Federal Defendants' Motion to Strike Extra–Record Evidence

In the second evidentiary motion, the Federal Defendants ask this court to strike six exhibits from the record (Doc. # 69–1). For the reasons explained below, the court GRANTS the motion in part.

### A. SUWA's Exhibit 6 and 11

 The court DENIES the motion to strike the maps attached as Exhibits 6 and 11 to SUWA's opening brief. However, these maps will be used for only two purposes: (1) as a graphic depiction of information already in the record, such as the location of seismic lines and the approximate Project boundary; and (2) to "adequately explain" the BLM's actions by illustrating the locations of pending and producing wells.[25]

### B. SUWA's Exhibit 10

 The court GRANTS the motion to strike Exhibit 10, which is an EPA letter dated October 29, 2002. SUWA argues that it should be admitted since "the record is deficient because the agency ignored relevant factors it should have considered in making its decision." [26] SUWA argues that this letter provides evidence that the BLM did not adequately address the EPA's concerns. However, this letter is dated October 29, 2002–25 days after the October 4, 2002 BLM decision at issue was given. While it may be true that this letter reiterates unresolved concerns from the EPA's September 9, 2002 letter, SUWA can adequately address the EPA's comments by referencing the EPA's September 9, 2002 letter that is properly in the record. The court will not supplement the record to include the EPA's comments written after the BLM issued its FONSI. Therefore, the court strikes this letter

**22.** *Id.; American Mining Congress v. Thomas,* 772 F.2d 617 (10th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986).

**23.** *Id.* at 626.

**24.** *Custer County,* 256 F.3d at 1029.

**25.** *See American Mining Congress,* 772 F.2d at 626.

**26.** *American Mining Congress,* 772 F.2d at 626.

from the record and will not consider it further.

### C. Veritas' Exhibit 1

■ The court DENIES the motion to strike Exhibit 1—a map detailing seismic line configuration for the Project. However, the court will only review this exhibit for two limited purposes: 1) as an illustration of information already in the record, such as the location of existing oil and gas fields and wells; and 2) to "adequately explain" the BLM's actions by illustrating the locations of pending and producing wells.[27]

### D. Veritas' Exhibit 3

For the reasons stated above, the court DENIES the motion to strike Veritas' Exhibit 3—which are the same photographs and other documents that the court considered in Veritas' Motion to Supplement the Record. As explained above, the court will consider these materials only to the extent that they demonstrate whether the BLM's evaluation of the remedial measures at issue was right or wrong.

### E. Veritas' Exhibit 4

■ The court GRANTS the motion to strike Exhibit 4—which is Rick Trevino's Affidavit, describing the sequence of the Project. The court finds that this case is not so complex and the record is not so unclear that this Affidavit is necessary to enable the court to understand the issues at hand.

For these reasons, the court GRANTS IN PART and DENIES IN PART the Federal Defendants' Motion to Strike (Doc. # 69–1).

27. *Id.*

28. Plaintiffs' Brief at 1.

## III. Appeal of the BLM's Finding of No Significant Impact on the Veritas Project

In this appeal, SUWA argues that the BLM's approval of the Veritas Project violated the National Environmental Protection Act ("NEPA") and the National Historic Preservation Act ("NHPA") in several ways.[28] First, SUWA alleges that the BLM violated NEPA by failing to sufficiently consider alternative proposals to the Veritas Project. Second, SUWA alleges that the BLM violated NEPA by failing to analyze the Project's indirect effects on soils, vegetation, wildlife, and archeological resources. Third, SUWA claims that the BLM failed to take into account the "cumulative effects" of the Project on soils, vegetation and wildlife, when considered in combination with other Projects occurring in and around the Project area. Fourth, SUWA alleges that the BLM violated NEPA by incorrectly relying on various mitigation measures designed to lessen environmental impacts in the Project area. Fifth, SUWA contends that the BLM violated the NHPA by failing to complete the requirements of Section 106 of that Act. Sixth, SUWA argues that the BLM violated the NHPA by arbitrarily narrowing the "Area of Potential Effects." Finally, SUWA argues that the BLM acted arbitrarily and capriciously by failing to properly assess the adverse effects on historic properties in and around the Project. Because of these alleged defects in the BLM's analysis, SUWA asks this court to remand the Project's Environmental Assessment ("EA") for further study, and the stop the Project until this study is completed.[29] For the reasons stated below, the court DENIES SUWA's request.

29. Plaintiffs' Brief at 2.

## Standard of Review

Under the Administrative Procedures Act ("APA"), the court may overturn an agency's administrative decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[30] This is a narrow and deferential standard, and the "court is not empowered to substitute its judgment for that of the agency."[31] As explained by the Tenth Circuit, federal courts "are limited to determining whether the agency substantially complied with statutory and regulatory procedures, whether substantial evidence supports its factual determinations, and whether its action was an abuse of discretion."[32] An agency's legislative interpretation may be disregarded only when it is contrary to the plain and unambiguous statutory language, or if it is not a permissible interpretation of ambiguous statutory language.[33] Moreover, an "agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference."[34] Finally, agency decisions are entitled to a presumption of regularity,[35] and the burden of proof is on SUWA, who is challenging the agency's decision.[36]

### A. The BLM did not Violate NEPA

SUWA alleges that the BLM violated NEPA on four grounds: (1) by inade-quately considering the range of alternatives in an independent analysis; (2) by inadequately analyzing the Project's indirect effects; (3) by inadequately analyzing the Project's cumulative effects; and (4) by relying on speculative mitigation measures in issuing its FONSI. For the reasons explained below, the court finds that the BLM did not violate NEPA in issuing its FONSI and approving the Project.

### 1. The BLM's Analysis Independently and Adequately Considered a Reasonable Range of Alternatives

■ The court finds that the BLM conducted an adequate independent analysis of the proposed Project and that SUWA has failed to show that the BLM failed to consider reasonable alternatives. SUWA first challenges the FONSI on the basis that the BLM failed to conduct its own evaluation of the proposed Project. Under NEPA, the BLM must "independently evaluate" applicant-prepared NEPA documents, and make its "own evaluation" of the environmental issues discussed therein.[37] Here, the BLM resource specialist reviewed the proposed Project,[38] prepared independent reports,[39] reviewed multiple drafts of the EA,[40] and consulted various federal and state agencies and members of the public to determine the Project's im-

---

30. 5 U.S.C. § 706(2)(A); *see also Custer County Action Ass'n v. Garvey*, 256 F.3d at 1029.

31. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

32. *Burke v. Board of Governors*, 940 F.2d 1360, 1365 (10th Cir.1991); *cert. denied*, 504 U.S. 916, 112 S.Ct. 1957, 118 L.Ed.2d 559 (1992)(citing 5 U.S.C. § 706(2)(A), (2)(D), 2(E)).

33. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Quivira Min. Co. v. U.S. Nuclear Regulatory Com'n*, 866 F.2d 1246, 1249 (10th Cir.1989).

34. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir.1993).

35. *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. 814.

36. *Park County Resource Council, Inc. v. U.S. Dept. of Agriculture*, 817 F.2d 609, 621 (10th Cir.1987).

37. 30 CFR 1506.5(a) and (b).

38. *See* AR at 274–94.

39. *See id.* at 1353–75.

40. *See id.* at 391–95, 404–06.

pact.[41] The court finds that these efforts constitute a sufficient independent evaluation under NEPA.

 SUWA next contends that the BLM failed to adequately consider reasonable alternatives to the Project. Under NEPA, the range of alternatives that an agency must consider is narrower when the agency has found (as the BLM found here) that a Project will not have a significant environmental impact.[42] The law requires the BLM to only consider *reasonable* alternatives, which are limited to those that SUWA has shown will accomplish the purpose of the Project.[43] In this case, the Project's purpose is to:

> determine the potential for the occurrence of oil and gas resources in the underlying formations and to identify areas where drilling wells would have a higher probability of finding commercial quantities of hydrocarbons than if such seismic data were unavailable.[44]

In its letter dated September 3, 2002, SUWA advised the BLM of several alternatives that the BLM should have considered. SUWA wrote that to "comply with the letter and spirit of NEPA, the EA must fully analyze at least the following additional alternatives: (1) using shotholes on existing roads and trails; (2) the use of existing seismic data in place of the proposed action; (3) not conducting any seismic activities in proposed wilderness areas; and (4) limited exploratory drilling."[45]

The BLM acknowledged receiving SUWA's letter, but submits that SUWA has not and cannot meet its burden of demonstrating that these alternatives are feasible in light of the Project's purpose.[46] The court agrees with the BLM on this point. At the April 9, 2003 hearing, SUWA acknowledged that its strongest argument is that the BLM should have considered the first alternative: limiting seismic exploration to existing roads and trails. However, SUWA has failed to demonstrate that using existing roads, which are not straight, meets the Project's purpose, which requires configuring shotholes in straight lines at 330–foot intervals. Instead, SUWA points to a recent case, *SUWA v. Norton*,[47] where the District Court for the District of Columbia held that the BLM was not permitted to rely on an applicant's self-serving statement that keeping to existing roads would not meet the Project's purposes.[48] However, the D.C. case is distinguishable on two grounds. First, in that case, the BLM was faced with a public comment that specifically questioned the accuracy of evidence that the project's goals could not be met by using existing roads and trails.[49] Specifically, the BLM in that case had not questioned the statements of the project's applicants and reasoned that it was "justified in relying upon the admittedly self-serving statements of the applicant because [he] was a scientist."[50] In contrast,

---

**41.** *See id.* at 31, 120–21, 225–26.

**42.** *See Central South Dakota Co-op. Grazing Dist. v. Secretary of the U.S. Dept. of Agriculture,* 266 F.3d 889, 897 (8th Cir.2001); *Mt. Lookout—Mt. Nebo Property Protection Ass'n v. F.E.R.C.,* 143 F.3d 165, 172 (4th Cir.1998).

**43.** *Custer County Action Ass'n,* 256 F.3d at 1041.

**44.** *See* AR at 28.

**45.** *See id.* at 958 (internal references and emphasis omitted).

**46.** *See* Federal Defendants' Opposition Brief at 22.

**47.** 237 F.Supp.2d 48 (D.D.C.2002).

**48.** *See id.* at 54.

**49.** *See id.* at 52.

**50.** *See id.* at 53.

the BLM in this case was not faced with a specific challenge to evidence that existing roads could be used and still meet the Project's goals. Rather, the BLM was only faced with the general statement that this option should be considered.

Second, the D.C. case is distinguishable because there the court specifically noted that "the public commenter asserted that he had twenty years of experience with seismic mapping and that he was well acquainted with seismic equipment, terminology, and survey methods."[51] In stark contrast, SUWA has not asserted any such expertise. On these two bases, the D.C. case is distinguishable. Accordingly, the court finds that, in this case, SUWA has not met its burden of showing that its proposed alternatives are feasible or that the BLM improperly rejected these alternatives as impractical.

In terms of the remaining three alternatives, the court finds that SUWA has failed to meet its burden of establishing that any of these alternatives are reasonable considering the Project's objectives. SUWA failed to cite anything in the Administrative Record from which the court could conclude that the BLM's assessment not to analyze these alternatives was inaccurate, ill-considered, or otherwise in violation of the law.[52] Accordingly, the court finds that it was sufficient under NEPA for the BLM to analyze the proposed Project and the no-action alternative.[53]

## 2. The BLM Adequately Analyzed the Reasonably Foreseeable Indirect Effects of the Project

■ SUWA next alleges that the BLM failed to take a "hard look" at the environmental consequences of the Project by failing to analyze the indirect effects of increased recreational offhighway vehicle ("OHV") use on sensitive species and other resources.[54] SUWA bears the burden of pointing to record evidence to dispute the reasonableness of the BLM's analysis.[55] Here, the court finds that SUWA has not met its burden. The record contains evidence that the BLM considered the reasonably foreseeable impacts of increased OHV use in the Project area and properly concluded that such impacts were not significant.

■ In determining whether a proposed action will have significant impacts, the federal regulations and case law make clear that this court must consider both the context of the impacts as well as their intensity.[56] Thus, an impact that could be significant in isolation may be insignificant when compared to other impacts in the affected locale.[57] The applicable regulations and case law also make clear that while agencies must consider the indirect effects of a proposed action that are "reasonably foreseeable," they need not consider "highly speculative or indefinite" potential effects.[58] Thus, the BLM is under no duty to speculate about all conceivable im-

51. Id.

52. See Custer County Action Ass'n., 256 F.3d at 1041.

53. See AR at 45; Federal Defendants' Opposition Brief at 19–21.

54. Plaintiff's Brief at 21–22.

55. See Custer County Action Ass'n. 256 F.3d at 1041.

56. See 40 C.F.R. § 1508.27(a) ("Significance varies with the setting of the proposed action.").

57. See e.g. Hanly v. Kleindienst, 471 F.2d 823, 831 (2nd Cir.1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); State of N.C. v. F.A.A., 957 F.2d 1125, 1134 (4th Cir.1992); Coalition on Sensible Transp. v. Dole, 642 F.Supp. 573, 586 (D.D.C.1986); Kisner v. Butz, 350 F.Supp. 310, 323 (N.D.W.Va.1972).

58. 40 C.F.R. § 1508.8(b); Presidio Golf Club v. National Park Service, 155 F.3d 1153, 1163 (9th Cir.1998); Sierra Club v. Marsh, 976 F.2d 763, 768 (1st Cir.1992).

pacts of the Project, but must only evaluate its reasonably foreseeable effects.[59] In this case, the EA and the DR/FONSI considered the reasonably foreseeable impacts of increased OHV use, and concluded that such impacts were not significant in light of the scope of the Project, the existing uses of the Project area, and the mitigation measures put in place.

### a. Soils, Vegetation and Archaeological Sites

The EA recognizes that the Project will likely cause certain impacts to biological soil crusts, vegetation, and archaeological sites. However, SUWA alleges that the EA does not sufficiently analyze the extent of these indirect effects and thus the BLM could not reasonably conclude that they are insignificant.[60] After reviewing the parties' briefs, the administrative record, and the relevant law, the court finds that the EA adequately considered the scope of the Project, the existing uses in the Project area, and the mitigation measures, and properly concluded that both the Project's impacts and the impacts of subsequent OHV use would be insignificant.

To begin, the BLM described the environment affected by the Project and by subsequent OHV use.[61] As to soils, the EA states that most soil surfaces in the Project area that receive direct sunlight are likely to have a biological soil crust, but that such crusts would not be present or would be present in areas that have been previously disturbed.[62] As to vegetation, the EA identifies the different types of vegetation in the Project area and the effects of a four-year drought on vegetation.[63] Finally, as to archeological resources, the EA identifies the location of fossils within the Project area in relation to specific seismic lines.[64] After identifying the affected environment for soils, vegetation and archeological resources, the EA discusses the Project's potential impacts on these three resources.[65]

Regarding the potential impacts on soils and vegetation, the EA states that the Project will result in surface disturbance caused by truck-and-buggy-mounted drills and other types of vehicles,[66] and that such surface disturbances will result in increased soil erosion and sediment yields, increased soil compaction, loss of soil and vegetative productivity, and the long-term loss of soil crusts.[67] The EA also states while impacts to vegetation in areas where heli-portable drilling can be utilized will be minimal,[68] in areas where drilling will be done by using truck-and-buggy-mounted drills and ATVs, there will be crushing and flattening of grass, forb, and shrub species. Regarding the potential impacts on archaeological resources, the BLM again acknowledges that since vehicles associated with the Project will drive through the Project area, there will likely be some palentological resources inadvertently damaged.[69]

Although the EA acknowledges these various disturbances, it goes on to require several mitigation measures designed to

---

59. *See Dubois v. U.S. Dept. of Agric.*, 102 F.3d 1273, 1286 (1st Cir.1996), *cert. denied*, 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997); *Sierra Club*, 976 F.2d at 773.

60. Plaintiffs' Brief at 23–24.

61. AR at 46–48.

62. *Id.* at 48.

63. *Id.*

64. *Id.*

65. *Id.* at 78–85.

66. *Id.* at 78.

67. AR at 81.

68. *Id.*

69. *Id.* at 84.

minimize these impacts. Specifically, the BLM required that all signs of vehicle tracks must be removed by raking out tread imprints and restoring tracks to their original contours, that soil compacted during the Project must be hand-raked, that certain areas must be seeded with a mixture of native plants, that waterbars must be constructed where appropriate, and that seismic lines must be closed to vehicle travel with signs and barricades as necessary.[70] For archaeological reasons, the DR/FONSI requires that a qualified paleontologist either survey two segments along seismic line 14 to collect fossils and related locational data, or accompany the seismic and support crews during the drilling phase of the Project along that seismic line and advise crews on avoidance of archaeological resources.[71]

After reviewing the Project's effects in light of these mitigation measures, the BLM concluded that the Project's effects on soils, vegetation, and archeological resources are insignificant. The BLM reached this conclusion after considering the substantive comments it received, the current information on the rate of recovery of cryptobiotic crusts and soils and vegetation from human-caused disturbances,[72] the BLM's previous observations of the recovery of soils and vegetation from another geophysical exploration Project in the area,[73] and the past, present, and future impacts in the Project area from authorized uses of this land (including oil and gas exploration and drilling, mining, livestock grazing, on-and-off-road vehicle use, and other recreation).[74]

Based on this information, the BLM issued its DR/FONSI for several reasons. For one thing, the amount of surface disturbance is very small in comparison to the Project area—only 0.02%.[75] Also, the impacts to biological soil crusts will be further limited to only those areas where biological crusts occur—which is only a portion (the exact percentage is unknown to the BLM at this time) of the area generally affected by the Project.[76] Moreover, the vegetation affected by the Project is expected to recover. The grasses and forbs are expected to recover within one to three years following the surface disturbance, and the shrub species are expected to recover within three to five years following surface disturbance, or longer if existing drought conditions continue. For smaller stature red shrubs, such as the Wyoming sagebrush, the crushing of plants combined with four years of drought, is expected to result in a high probability of mortality.[77]

In addition, while the impacts of subsequent OHV use is acknowledged, the EA concludes that this impact is insignificant given the current level of OHV use within the Project area, the potential for increased OHV use in the area regardless of the Project, and the mitigation measures put in place. Specifically, the EA reports that registration and sales for ATVs and dirt bikes increased 294% in the State of Utah in the last five years. Further, approximately 34,000 machines were registered in Utah in 1997 and over 100,000 were registered in 2001.[78] This increase in

70. *Id.* at 81, 234.

71. *Id.* at 84–85, 235.

72. AR at 79–80, 122.

73. *Id.* at 78, 249–50.

74. *Id.* at 46, 118–19.

75. *Id.* at 78, 80.

76. *Id.* at 80.

77. *Id.*

78. AR at 77.

the area of the state encompassing the Project has been confirmed through recent monitoring conducted by the Utah Division of State Parks and the BLM's Vernal Field Office.[79] Moreover, 60% of the Project's land is currently open to cross-country OHV use.[80] Hunting by use of pickup trucks and ATVs already totals approximately 4,000 user days (any portion of a calendar day) per year.[81] Further, travel routes exist through the Project area as a result of continued oil and gas development, wood cutters, sheep herders, recreationists and fire fighting crews.[82] Consequently, although the possibility exists that some of the Project's seismic lines could lead to new travel routes for OHVs in the future, travel routes already exist throughout the Project area and could increase regardless of the Project.

Moreover, the mitigation measures required by the DR/FONSI would further limit unwanted OHV use in sensitive areas and prevent the proliferation of unwanted OHV trails by prohibiting cross-country travel between seismic lines during the acquisition of seismic data, obliterating OHV trails associated with the Project where they cross existing roads and trails, and installing additional signs or barriers to prevent future OHV travel on routes used during geophysical operations.[83]

After reviewing the BLM's analysis of the Project's affected area, the potential impacts on this area, and the minimizing effect of certain mitigation measures, the court finds that SUWA has failed to demonstrate that the BLM's FONSI regarding soil, vegetation, and archaeological sites violated NEPA.[84]

In reaching this conclusion, the court is unpersuaded by SUWA's argument that the Environmental Protection Agency's ("EPA") warning that indirect impacts from the Project should be expected due to the increase in OHV use in the Uintah Basin is a basis for reversing the BLM's FONSI. NEPA does not require the BLM to agree with the EPA's viewpoint, but only requires the BLM to consider it and respond to it if it is submitted within the public comment period.[85] In this case, the EPA's comment letter is dated September 9, 2002, six days after the close of the comment period.[86] Further, the EPA letter does not contradict the BLM's analysis, but expresses the same concerns as the BLM expressed about OHV use.[87] Thus, the EPA's concerns do not detract from the BLM's analysis.

### b. Sensitive Bird Species

SUWA also claims that the EA fails to analyze the indirect effects of subsequent OHV use on a number of sensitive bird species, namely raptors, bald eagles, Mexican spotted owls and mountain plovers.[88] Specifically, SUWA claims that OHV use can fragment habitat and harass, displace, and even kill wildlife, and that the BLM has ignored the year-round impact of OHV use on these species.[89] The court finds

79. *Id.*

80. AR at 76.

81. *Id.*

82. AR at 77, 113.

83. *Id.* at 234.

84. *Custer County Action Ass'n.*, 256 F.3d at 1041.

85. 40 C.F.R. § 1503.4.

86. AR at 1305–10.

87. *Id.* at 1396.

88. Plaintiffs' Brief, at 22.

89. *Id.*

that the BLM properly considered the reasonably foreseeable impacts of increased OHV use on sensitive bird species and reasoned that such impacts were not significant given the existing uses within the Project area and the mitigation measures designed to reduce the potential for damage.

The BLM's analysis of the Project's effects on sensitive bird species relies partly on the Biological Assessment ("BA") which was prepared by BLM biologists and the Concurrence Letter prepared by the FWS on the impacts of the Project on threatened, endangered, proposed, candidate and sensitive species. Like the BA and the Concurrence Letter, the EA begins its analysis with a discussion of the status of various bird species and the habitat present in the Project area.[90] As to raptors, the EA states that a number of raptor species nest within the Project area and approximately 65 raptor nests are known to occur within one-half mile of most of the proposed seismic lines.[91] Bald eagles are also present in the Project area during winter; however, no bald eagles' nests occur within the Project area.[92] While the Mexican spotted owl has been recorded in the southern portion of the Book Cliffs and potential habitat exists in the Book Cliffs portion of the BLM Vernal Field Office, no critical habitat exists within approximately 10 miles of proposed seismic lines.[93] The mountain plover has also been observed within the Project area within one mile of seismic line two.[94] The record also indicates that plover habitat includes short-grass and shrub-steppe landscapes, dryland, cultivated farms, and prairie dog towns and that usual nest sites within the shrub-steppe are on active prairie dog towns. Nests have also been found on oil and gas well pads.[95]

Although it is unclear, the EA appears to rely on the BA and the Concurrence Letter in discussing the Project's environmental consequences on these species. The EA acknowledges the vulnerability of several bird species and the risks involved in the Project. Specifically, as to raptors, the EA states that Project activities along the seismic lines would disrupt breeding activities.[96] In addition, nest abandonment, nest destruction, and/or loss of chicks or adults could occur due to the use of helicopters, pickup trucks, truck mount drills, buggies, portable drills, ATVs and foot travel traversing seismic lines.[97] The EA acknowledges that the loss of an individual in any raptor species would result in a loss of local population viability due to the low population numbers in northeastern Utah.[98] As to bald eagles, the EA states that Project activities along portions of the seismic line occupied by wintering bald eagles would result in disruption of foraging activities and displacement.[99] In addition, the EA acknowledges that Project activities during the breeding season could disrupt breeding.[100] With respect to the Mexican spotted owl, Project activities may disrupt breeding activities and result in nest abandonment and/or loss of chicks.[101] The EA states that the loss of

90. AR at 60–61, 164–65, 1358.

91. *Id.* at 51, 89–90.

92. *Id.* at 60, 93, 164, 1358.

93. AR at 60–61, 95, 164, 1358.

94. *Id.* at 61, 95, 138.

95. *Id.* at 95, 169, 1358.

96. *Id.* at 89.

97. *Id.*

98. *Id.* at 90.

99. AR at 93–94, 171, 1365.

100. *Id.* at 171, 1365.

101. *Id.* at 95, 168, 1363.

an individual owl would result in a loss of local population viability due to the low population number of the species in northeastern Utah.[102] Project activities would similarly disrupt the mountain plover. The EA states that Project activities may disrupt breeding activities and result in nest abandonment, nest destruction and/or loss of young or adults.[103] Similarly, loss of an individual would result in a loss of local population viability due to the low population number of the species in northeastern Utah.[104] However, although the EA acknowledges these risks, the BLM carefully considered these risks and concluded that in light of the low levels and temporary nature of habitat disturbances, there would be no or very minimal habitat fragmentation for any of these species.[105]

SUWA also argues that impacts from subsequent OHV use will include: for bald eagles, disruption of winter roosting sites, which may preclude nesting;[106] for the Mexican spotted owl, disturbance of potential nesting habitat, reduction in habitat suitability, and increased habitat fragmentation;[107] and for mountain plovers, increased habitat fragmentation, reduction of suitable habitat and forage, and a potential increase in nest destruction or reproductive failure.[108] However, the EA reasoned that, as with other resources, impacts on sensitive bird species will be insignificant given the long-term activities within the Project area, including oil and gas development, cattle grazing, increased

recreational OHV use, and drought.[109] The BLM's analysis is supported by the Fish and Wildlife Service, the agency charged with protecting and promoting the recovery of species found to be threatened or endangered, which concurred with the BLM's determination that the Project would not adversely affect these species.[110]

Finally, the EA recommends and the DR/FONSI requires implementation of several mitigation measures to ensure no significant adverse Project impacts sensitive bird species.[111] These measures include complete avoidance of bald eagle winter roost areas from November 1 to March 15 and complete avoidance of active bald eagle nests from January 1 to August 15;[112] seasonal avoidance of the ten miles of the Mexican Spotted Owl's potential breeding habitat from March 1 to August 31;[113] and seasonal avoidance of the eight miles of mountain plover habitat from May 1 to June 15.[114]

The EA also recognizes that certain special conditions and other mitigation requirements would reduce impacts to sensitive bird species.[115] Specifically, these mitigation measures include prevention of the proliferation of unwanted OHV use in sensitive areas by prohibiting cross-country travel between seismic lines during acquisition of data, obliterating OHV trails resulting from the Project where they cross existing roads and trails, and installing additional signs and barriers to pre-

102. *Id.* at 95, 168, 1364.

103. *Id.* at 95, 175, 1364.

104. *Id.*

105. AR at 93.

106. *Id.* at 171, 1365.

107. *Id.* at 171, 1364.

108. *Id.* at 176, 1365.

109. *Id.* at 168–69, 176, 1364–1365.

110. *Id.* at 178.

111. AR at 105, 165.

112. *Id.* at 105, 177, 1369.

113. *Id.* at 106, 165, 177, 1367.

114. *Id.* at 106, 178, 13668.

115. *Id.* at 106.

vent future OHV travel on routes used during Project operations.[116]

■ While the court acknowledges the various risks that the Project may have on sensitive bird species, in reviewing the EA, this court is "limited to determining whether the agency substantially complied with statutory and regulatory procedures, whether substantial evidence supports its factual determinations, and whether its action was an abuse of discretion."[117] After reviewing the EA, the parties' briefs and the relevant law, the court finds that the BLM adequately considered the reasonably foreseeable indirect impacts of the Project on sensitive bird species and properly concluded that such impacts were not significant given existing uses within the Project area and the mitigation measures designed to limited unwanted OHV use. Therefore, the court finds that the BLM has met NEPA's requirement to analyze the Project's indirect impacts.

### 3. The BLM Adequately Analyzed the Cumulative Effects of the Project

■ While SUWA argues that the BLM failed to adequately analyze the cumulative effects of other projects on the Veritas Project area, the record reflects that the BLM sufficiently met the Tenth Circuit's test for analyzing cumulative effects. NEPA requires the BLM, when determining whether a Project requires a full Environmental Impact Statement ("EIS"), to consider the cumulative environmental impacts of the Project. The Counsel on Environmental Quality

("CEQ") Regulations define a "cumulative impact" as, "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonable foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[118] In its appeal, SUWA argues that the BLM inadequately analyzed the impacts of several existing and reasonably foreseeable projects which are in the same geographic region as the Veritas Project.

In determining the test for what must be analyzed as "cumulative impact," SUWA argues that the Tenth Circuit has "typically analyzed NEPA's cumulative effects requirements in the context of segmented agency action, in which the NEPA question went to the scope of the action that must be considered in the NEPA review, rather than the nature of the impacts that must be disclosed."[119] Therefore, SUWA concludes that the Tenth Circuit case which the BLM relies on, *Park County Resource Council, Inc., v. United States Dept. of Agric.*,[120] is not "particularly instructive" as to the nature of the analysis required when considering cumulative impacts in this case, and argues that the court should adopt language from the D.C. Circuit. The court finds no language in the Tenth Circuit's decisions cited by SUWA to suggest that *Park County Resource* is not the controlling law on cumulative effects analysis. In *Park County Resource*, the Circuit held that "the bench-

---

116. *Id.* at 227, 234.

117. *Burke v. Board of Governors*, 940 F.2d at 1365 (citing 5 U.S.C. § 706(2)(A), (2)(D), 2(E)).

118. CFR 1508.7; *see Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 430 (10th Cir.1996).

119. Plaintiffs' Brief at 31.

120. 817 F.2d 609 (10th Cir.1987), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir.1992), *cert. denied*, 506 U.S. 817, 113 S.Ct. 59, 121 L.Ed.2d 27 (1992).

mark signaling the need for a cumulative impact EIS" is whether projects are "so interdependent that it would be unwise or irrational to complete one without the others." [121] Similarly, in *Airport Neighbors Alliance, Inc. v. United States*,[122] the Circuit reemphasized that the test for whether particular actions could be considered cumulative impacts is whether the actions were "so interdependent that it would be unwise or irrational to complete one without the others." [123] Most important, the Tenth Circuit does not rely, as SUWA claims, on 40 C.F.R. § 1508.25, which deals with the scope of an EIS. Instead, the issue in *Airport Neighbors Alliance* was similar to the issue here—a challenge to the issuance of a FONSI after an EA had been performed. Therefore, the Tenth Circuit's test-whether the actions are so interdependent that it would be unwise or irrational to complete one without the others—is the correct test to apply to SUWA's allegation.

Under this test, the court finds that the BLM has adequately analyzed the cumulative effects of the Project. The record does not support SUWA's allegation that upholding the BLM's actions and arguments would in effect "write the cumulative effects analysis out of NEPA in most instances." [124] To the contrary, the BLM acknowledged that there are "numerous oil and gas leases" in these areas, and that "future development could affect wilderness characteristics that may occur at present." [125] However, the BLM concluded that "compared to the major developments in the area such as roads, Gilsonite mines, and oil and gas fields, cumulative impacts from the 381 acres of surface dis-

turbance would represent 0.02% of the Project area" which justified its FONSI.[126] SUWA alleges that the BLM should have specifically considered the following seven projects or actions in its EA:

1) RDG Uintah Basin Natural Gas Project—This project occurs entirely within the boundaries of the Veritas Project and involves the development of 420 new gas wells in addition to the 64 that already exist.

2) Castle Peak and Eightmile Flat Expansion Project—This project is immediately adjacent and overlapping with the northwest boundary of the Veritas Project.

3) Wolf Point Pipeline Project—This project overlaps the boundaries of the Veritas Project on the southwest border. No final decision has been issued on whether this project will go forward.

4) Horse Point 3–D Seismic Project—This project is south of the Veritas boundary and is currently on-going.

5) Stone Cabin 3–D Seismic Project—This project is to the west of the Veritas Project. The BLM is currently preparing an EA of this project.

6) Wells Draw 2–D Seismic Project—This project was completed in July 2000 and is located west of the Veritas Project boundary line.

7) Existing Oil and Gas Wells—There are currently 3000 oil and gas wells in the project area and approximately 5000 in Unitah and Duschene Counties overall.[127]

121. *Id.* at 623.

122. 90 F.3d 426 (10th Cir.1996).

123. *Id.* at 426.

124. *See* SUWA's Reply Brief at 19.

125. *See* AR at 118–119.

126. AR at 119, 143–44.

127. *See* Plaintiff's Brief at 32–33.

The court disagrees with SUWA that the BLM was required to individually analyze these projects because none of them are so interdependent with the Veritas Project that it would be "unwise or irrational" to complete Veritas without also completing them. While the Veritas Project is a large-scale seismic exploration that would be useful in potential oil and gas resources, oil and gas may never be developed in the Project area. It is just as plausible that the results of the Veritas Project will reveal that drilling wells or developing oil and gas would not be productive. If the court were to adopt SUWA's requirements, the BLM would have to run a full cumulative impact EIS on speculative projects that might never be pursued, a result that would lead to an impermissible "gross misallocation of resources."[128] This conclusion is supported by *Airport Neighbors Alliance*,[129] where the Tenth Circuit held that while an airport runway extension was part of an overall master plan for the city of Albuquerque, the runway's upgrade did not "necessarily signal a commitment to proceed" with the rest of the master plan.[130] Similarly, in this case, SUWA has not shown that any of the projects they have put forward are connected to Veritas because they "cannot or will not proceed" unless the Veritas Project proceeds.[131] Nor has SUWA shown that proceeding with the Veritas Project is necessarily a commitment to the other projects it references. Since none of the projects cited by SUWA are specifically related to the Veritas Project, any of them could be abandoned without detracting from the Project's purpose.

For these reasons, the court finds that the BLM adequately considered the cumulative effects of other projects and did not violate NEPA's requirements on this issue.

### 4. The BLM Appropriately Relied on Mitigation Measures

 SUWA alleges that the BLM's mitigation measures were not sufficient to allow it to issue a FONSI. After reviewing the administrative record and hearing oral argument on this issue, the court disagrees. As part of its environmental assessment, the BLM imposed several measures designed to mitigate the potential environmental effects of the Veritas Project. To mitigate impacts to soils and vegetation, the BLM proposed: (1) removing signs of vehicle tracks by raking out tread imprints where visible from existing roads and trails, (2) raking out vehicle ruts and restoring them to their original contour, (3) scarifying compacted areas by hand raking, (4) reseeding scarified areas, (5) installing waterbars where necessary, (6) raking in biological crusts on areas where tracks are made, and (7) closing seismic lines to post-Project vehicle travel with signs and barriers as it becomes necessary to prevent seismic lines from use by future off-road vehicles.[132]

The BLM also proposed to mitigate environmental effects on wildlife and birds by imposing seasonal restrictions on drilling and explosive detonations. First, there could be "[n]o drilling and no explosives [ ] detonated between May 10 and June 1 in the Monument Ridge migration corridor, in order to protect the migration of mule deer."[133] The agency also ruled that "no drilling would occur or explosives

**128.** *Airport Neighbors Alliance*, 90 F.3d at 431. (citing *Park County*, 817 F.2d at 624).

**129.** 90 F.3d 426 (10th Cir.1996).

**130.** *Id.*

**131.** *Id.* at 431 n. 5

**132.** AR at 81, 83.

**133.** *Id.* at 92.

be detonated in elk or mule deer crucial winter range between November 15 and April 15 or in elk or mule deer crucial calving/fawning range between May 15 and June 30" without an exception granted by BLM.[134] Finally, the EA further noted that "[b]lack bears would be afforded some of the benefits associated with big game mitigation,"[135] and "complete mitigation for raptors would be seasonal avoidance of raptor nests, a list of which is found in the EA at Table 2.2 in Section 2.1.5.8."[136]

Furthermore, BLM proposed mitigation measures for a significant number of threatened and endangered wildlife, including the bald eagle, the southwestern willow flycatcher, the western yellow-billed cuckoo, the Mexican spotted owl, the mountain plover, and young ferrets.[137] Regarding endangered plants, the EA provides that "[a]voidance of delineated suitable habitat and populations would be done instead of individual plants. Potential habitat areas would be surveyed ... occupied and suitable habitat would be delineated and avoided."[138]

To mitigate the effects of the Veritas Project on proposed wilderness lands, the EA requires shot-holes in those areas to be drilled with heli-portable equipment to minimize disturbance to soils and vegetation in those areas.[139] Considering all the available information, the EA concluded that "wilderness values would be completely restored through natural processes."[140]

SUWA alleges that the BLM failed "to describe their proposed mitigation measures in sufficient detail to ensure that environmental consequences have been fairly evaluated."[141] Further, SUWA cites to the Tenth Circuit's previous holding that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed [p]roject prior to making a final decision."[142]

However, SUWA has the burden of proving that the BLM's assessment of its mitigation measures was arbitrary and capricious.[143] While it is true that an EIS must include a discussion of possible mitigation measures, and that an agency's consideration of those measures must be reasonably complete in order to "properly evaluate the severity of the adverse effects" of a proposed Project,[144] NEPA does not require that an EA include the full and "reasonably complete" discussion of mitigation strategies required by an EIS.[145] Rather, an EA is only "a brief and concise public document" which provides "sufficient evidence" for either going through with the EIS process or issuing a FONSI. SUWA's proposed standard would require the BLM to create "a fully developed plan" before issuing a FONSI, a step which NEPA does not require.[146]

---

134. *Id.*

135. *Id.*

136. *See id.* at 42–44.

137. *Id.* at 105.

138. AR at 106.

139. *Id.* at 114.

140. *Id.*

141. *See* 40 C.F.R. §§ 1508.25(b), 1502.14(f), 1502.16(h), 1505.2(c).

142. *Colorado Environmental Coalition v. Dombeck,* 185 F.3d 1162, 1173 (10th Cir. 1999).

143. *See Custer County Action Ass'n,* 256 F.3d at 1029.

144. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

145. *Akiak Native Community v. U.S. Postal Service,* 213 F.3d 1140, 1147 (9th Cir.2000).

146. *See Robertson,* 490 U.S. at 359, 109 S.Ct. 1835.

Further, the Tenth Circuit has held that the BLM or another administrative agency may take mitigation measures into account when deciding to issue a FONSI, especially where those mitigation measures reduce environmental impacts below the level of impact that would trigger the EIS process.[147] Though mitigation measures can justify the BLM's decision not to prepare an EIS, the agency must do more than make "a perfunctory description or mere listing of mitigation measures."[148] It must develop the record to a reasonable degree, and show that the environmental consequences of the Project have been "fairly evaluated."[149] While it is true that NEPA does not require agencies to propose mitigation factors at all, the BLM has done so here. To the extent that those factors have been relied upon in the decision to issue the FONSI in this case, the BLM is required to reasonably discuss those factors; if it has done so, the court must determine whether those measures are discussed in a manner that fairly and thoroughly evaluated the Project's environmental consequences.

Though *Robertson v. Methow Valley Citizens Council* concerned an EIS, its holding was broad, and stated that "NEPA itself does not mandate particular results, but simply prescribes the necessary process."[150] Most important, the BLM may decide that "the adverse environmental ef-fects of [a] proposed action ... outweigh the environmental costs."[151] In *Methow Valley*, the Forest Service considered granting a permit for a new downhill skiing slope in Colorado. The Supreme Court held, "if the Forest Service, after complying with the Act's procedural requisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd" habitat, then the Forest Service could do so.[152] It concluded, "NEPA merely prohibits uninformed-rather than unwise" agency action.[153]

Mitigation measures are designed to reduce only those impacts which can be mitigated, and the EA discusses those impacts. It is clear that SUWA opposes the BLM's policy choices in granting the FONSI. But even if SUWA is correct from a policy standpoint, the court cannot overturn the BLM's decision as long as the BLM considered the environmental impacts of the Project in a manner consistent with the procedures set out by NEPA. The BLM correctly notes that even if this court found that it needed to prove the efficacy of its mitigation measures, it can do so by reviewing the record. Veritas conducted a prior seismic test similar to that being proposed here.[154] The BLM used the environmental impacts of that test to help determine its EA analysis.[155] These miti-

---

**147.** *Park County,* 817 F.2d at 621–622; *see also National Audubon Society v. Hoffman,* 132 F.3d 7, 17 (2nd Cir.1997); *Tillamook County v. U.S. Army Corps of Engineers,* 288 F.3d 1140, 1144 (9th Cir.2002).

**148.** Plaintiffs' Brief at 37–38 (citing *Neighbors of Cuddy Mountain v. U.S. Forest Service,* 137 F.3d 1372, 1380 (9th Cir.1998)).

**149.** *Robertson,* 490 U.S. at 352, 109 S.Ct. 1835.

**150.** *Id.; see also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Sierra Club–Black Hills Group v. U.S. Forest Service,* 259 F.3d 1281, 1287 (10th Cir.2001).

**151.** *Robertson,* 490 U.S. at 350, 109 S.Ct. 1835.

**152.** *Id.* at 351, 109 S.Ct. 1835.

**153.** *Id.*

**154.** *See* AR at 31.

**155.** *See id.*

gation techniques have also been made mandatory upon issuance of the FONSI. The BLM Compliance Officers are required to monitor the Project, and will be in a position to halt the Project if mitigation measures are not being followed.[156]

Therefore, the court disagrees with SUWA's basic contention that the BLM failed to discuss the efficacy of its mitigation measures, and therefore it was simply submitting a list of mitigation measures which is insufficient even to support an EA.[157] In fact, as detailed above, the Administrative Record shows that in submitting those measures, the BLM took into account environmental impacts to soil, vegetation, and wildlife that not only would be mitigated by those measures, but appropriately determined those impacts that would not be affected by mitigation. The court need not pass judgment on whether the BLM's actions were unwise. Instead, it only needs to decide whether the BLM's actions were arbitrary and capricious in light of the mitigation proposed by the agency. In this case, SUWA has not met its burden of proof to show that the BLM acted in such a manner.

SUWA next argues that the BLM failed to provide factual support for the effectiveness of its mitigation measures regarding soil and vegetation impacts. SUWA contends that the proposed effects of such mitigation are "speculative" and "illusory," and therefore an EIS is required to determine the full effect of the Project. To support this argument, SUWA claims that the BLM failed to back its FONSI assertion that "[r]esidual impacts to soils and

vegetation would essentially disappear within 3 to 5 years."[158] It claims that language in the EA to the effect that "long term loss of soil crusts" would result from the Project flatly contradict the FONSI's conclusion.[159] However, the EA recognizes that biological soil crusts will be affected by the Project and that opportunities for future damage by subsequent OHV use will increase. Despite this, the EA anticipates that a full recovery will be "dependent on numerous factors," and lists those factors.[160] Since recovery times "vary considerably," the EA cites several studies to contrast the effects on soil crusts as a result of other projects with the effects on soil crusts as a result of the Project.[161] Those recovery times, according to the studies cited, range from 14 years to hundreds of years.[162] Overall, the EA concludes that the Project "is expected to result in increased soil erosion and sediment yields, increased soil compaction, loss of soil and vegetative productivity, and the long-term loss of soil crusts."[163] Such a conclusion directly contradicts SUWA's allegation that the "agency failed to consider whether there would be significant impacts to the soils and their ecosystem functions."[164] While SUWA argues that the reference to "residual effects" has no backing in the EA, the use of the word "residual" suggests that the effects referred to by the FONSI are the kinds of aesthetic effects referred to in the EA's discussion of the Grand Canyon study. Either way, the record reflects the BLM's thorough awareness of the environmental impacts of the Project—it took a hard look at environ-

**156.** See id. at 230, 232.

**157.** See Plaintiffs' Brief at 39 (citing Dombeck, 185 F.3d at 1173).

**158.** AR at 223.

**159.** Id.

**160.** Id.

**161.** Id.

**162.** Id. at 54.

**163.** Id.

**164.** Plaintiffs' Brief at 34.

mental impacts. Several points lead the court to conclude that the BLM appropriately relied on mitigation measures in this case.

First, the EA and its suggested mitigation methods show that the BLM gave adequate consideration to the environmental effects, both in terms of direct recovery time and residual effects, of the Project. The BLM relied on a previous seismic study in the same area which found that soils would appear normal the following Spring.[165] Aesthetic impacts are among the impacts that the BLM must consider, and its proposed mitigation methods suggest that it considered those aesthetic impacts.

Second, SUWA also complains that the BLM's requirement that "no vehicles will be operated during periods of saturated soil conditions or when surface ruts are deeper than four inches" will be insufficient because it has been "routinely ignored" on another project.[166] It is hard to see how a private actor's compliance on another project is relevant to the efficacy of mitigation on this Project, especially where SUWA presents nothing to this court that overcomes the Court's presumption that the agency will monitor and enforce its requirements. Therefore, the court cannot find that the BLM acted arbitrarily in relying on its own enforcement capability to ensure mitigation techniques are followed.

Third, there is sufficient evidence in the record to show that the BLM took a hard look at the effects of increased OHV traffic as a result of the Project, and neither arbitrarily nor capriciously decided that such effects would be insignificant. In its brief, SUWA admits that the BLM took such effects into consideration. For in-

stance, the BLM noted that "[t]he subsequent use of the seismic lines for OHV use *would increase the opportunities for* damage to and vandalism of cultural resources."[167] Thus, it appears that the BLM has taken into account the environmental effects of offroad use, and found that without proper mitigation, the opportunity for further damage might occur. The mitigation measures proposed by the BLM are specifically designed to decrease those opportunities for damage that are caused by the Veritas Project, not the damage caused by offroaders itself. Specifically, the BLM has required Veritas to literally cover its tracks, thereby discouraging future off-roaders from following on those tracks. OHV use in the Project area is growing regardless of the Veritas Project, and while the BLM acted rationally in looking at increased OHV use that could fairly be attributed to the seismic Project in question, the increase in OHV use not related at all to the Veritas Project is not counted against the Project.

Fourth, SUWA incorrectly states that the agency has not presented any facts to show that raking out vehicle tracks will be an effective mitigation technique.[168] The EA states that "crusts crushed/buried in place with vehicles and foot traffic, are expected to recover much faster [than other damaged crusts] because adjacent crusts are available to provide inoculant sources to crusts crushed/buried by Project-related activities, thus facilitating recovery."[169] The BLM drew this conclusion based on all the information it had available to it, the resources cited in the EA itself.[170] Thus, there is support for this particular mitigation technique.

**165.** AR at 249.

**166.** Plaintiff's Brief at 42.

**167.** AR at 107 (emphasis added).

**168.** Plaintiffs' Brief at 43.

**169.** AR at 80.

**170.** *See id.*

As a result of taking these environmental factors into account, the BLM has proposed specific mitigation methods designed to minimize, but not totally ameliorate, the effects of the Veritas Project on soil and vegetation. In addition, it has provided a reasonable evaluation and explanation of how those mitigation efforts will mitigate potential environmental impact.

The same holds true for the BLM's analysis of mitigation measures regarding wildlife. SUWA argues that the EA is insufficient because it fails to discuss what it means by "partial" mitigation. In fact, the EA does distinguish between those environmental effects that mitigation measures are designed to minimize, and those that cannot be mitigated at all. The mitigation here is designed to minimize displacement of wildlife at crucial mating and migration times. Adverse impacts will be limited during those times. Otherwise, the EA provides that during seismic testing, "temporary displacement of big game and black bears would be unavoidable."[171] Since these effects will occur only in a very small portion of the overall Project area, the BLM decided that such effects, as partially mitigated, did not call for the further preparation of an EIS. SUWA has not met its burden to convince this court otherwise.

The EA also notes that temporary displacement will lead to "increased interspecific and intra-specific competition, reproductive failure, mortality and increased stress" among wildlife species.[172] The EA even contemplates a possible "direct loss of wildlife" in affected areas.[173] The specificity of the environmental impacts contemplated by the EA, in addition to the

reasonable consideration of possible mitigation for such effects, show that the BLM did take a "hard look" at environmental impacts, and that its issuance of the FONSI was not procedurally unsound. The BLM has taken the environmental effects of the Project into account and made its decision based on all available information. Therefore, this court finds that the BLM adequately discussed and analyzed the mitigation measures to fairly and thoroughly evaluate the Project's environmental consequences.

## IV. The BLM Did Not Violate the National Historic Preservation Act

SUWA's final argument is that the BLM violated the National Historic Preservation Act[174] (NHPA) in analyzing and approving the Project. The court disagrees.

The NHPA is a procedural statute designed to ensure that federal agencies assess the impacts on historic properties of proposed projects before such projects are approved. Under Section 106 of the NHPA, a federal agency must first identify the area potentially affected by the undertaking.[175] Then the agency must identify properties within the potentially affected area that may be eligible for inclusion in the National Register of Historic Places.[176] The agency must then evaluate whether the project will have adverse effects on those potentially historical places. Where an agency concludes that the undertaking may have adverse impacts on historic properties, it must determine ways of avoiding, minimizing or mitigating those adverse impacts.[177] If the agency determines that there will be

---

171. *Id.* at 92.

172. *Id.* at 85.

173. *Id.*

174. 16 U.S.C. §§ 470–470x6.

175. *See* 36 C.F.R. §§ 800.4(a)(1); 800.16(d).

176. *See id.* at § 800.4(a)-(c).

177. *See id.* at § 800.5(b).

no such effects, it may then propose a finding of no adverse effect to all consulting parties, including the state historic preservation officer (SHPO), relevant Native American Tribes, and the Advisory Council on Historic Preservation (Council). Unless the SHPO or the Council disagree with the ruling and intervene in the process, the agency may continue.

Before determining whether the BLM complied with Section 106, it is necessary to determine what the BLM actually did. The BLM determined the area of potential effects ("APE") for the Veritas Project, then conducted file searches in the BLM Vernal Field Office and the Utah State Historical Society in Salt Lake City for further information.[178] These searches located 121 prior surveys and 33 recorded historic sites in the Project area.[179] Of those 33 sites, 11 were considered eligible for inclusion on the NRHP. Following the file searches, the BLM surveyed 12 of the 17 seismic lines proposed by the Veritas Project, conducting Class III cultural resource surveys on each of the 12 lines. All sites located by those searches were marked and their status determined. Those sites deemed historic were evaluated for eligibility on the NRHP. Those sites near proposed shotholes were moved to ensure that the sites would not be adversely affected by the Project.

The BLM submitted copies of the draft EA to the Council, with a finding of no significant impact. The Council did not respond, which the BLM inferred to mean that it concurred in the BLM's conclusion. The BLM also submitted the draft EA to the Utah SHPO, who advised the BLM that it concurred with its determination.[180]

As part of the FONSI's issuance, the BLM also imposed conditions to ensure that Section 106 review would be completed before seismic work began on the five lines not yet completed. On the five non-cleared lines, the BLM required Veritas to conduct cultural resource surveys, and submit reports of those studies to the BLM, before beginning work on those lines.[181] Veritas responded by dropping the five unsurveyed lines from the Project.[182]

SUWA alleges that the BLM violated NHPA in three ways: (1) inappropriately approving work on 12 out of 17 lines under phases approached; (2) failing to accurately identify the Veritas Project's area of potential effects, and (3) acting arbitrarily and capriciously in issuing its FONSI.

## A. The BLM's Approval of Work on 12 of the 17 Lines Complies with Section 106

 SUWA first challenges the BLM for only completing the Section 106 process on 12 of the 17 seismic lines proposed by the Veritas Project. The BLM argues that it properly followed Section 106, which permits a "phased identification and evaluation" of projects in certain circumstances.[183] The relevant regulations provide that "where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process to conduct identification and evaluation efforts."[184] SUWA contends that "this regulation allows for phased evaluations only in situations where the agency is considering a number of alternatives and has not yet determined where the Project's impacts will actually

---

**178.** *See* AR at 1848–1875.

**179.** *Id.*

**180.** *Id.* at 1294–1296.

**181.** *Id.* at 238.

**182.** *See* Veritas' Brief at 41.

**183.** 36 C.F.R. § 800.4(b)(2).

**184.** *Id.*

occur." [185] This is not the case. The regulations clearly permit "deferral of final identification and evaluation if provided for in an agreement with the SHPO/THPO or other circumstances." [186] The SHPO's FONSI concurrence in this case appears to constitute such an agreement.

Even if such an agreement is lacking, the statute does not require a cramped interpretation of agency powers. The BLM may consider phased evaluation in appropriate circumstances. The Section 106 standard that the BLM must follow in this regard is one of "a reasonable and good faith effort ... to identify properties" and that "the level of effort [ ] in the identification process depends on *numerous factors including, among others listed, the nature of the undertaking* and its corresponding potential effects on historic properties." [187] Here, there are numerous factors for the BLM to consider, including the size of the Project involved, the nature of the potential historical sites at risk (particularly those that might be at risk because Section 106 analysis has not been performed), and the opportunity to complete Section 106 analysis before work begins. The BLM committed itself to complete the Section 106 process on the remaining five lines before beginning work on those lines. Furthermore, Veritas subsequently dropped those five lines from the Project, suggesting that even if the BLM had erred in continuing to work

on the twelve lines, such error was harmless. Since the Veritas Project is a linear Project spread over a very large area (though affecting only a very small part of that area), it is a good candidate for the flexibility implied by the statute and discussed by the Council. Other courts have deferred to similarly flexible approaches.[188] As such, this court cannot find fault with the BLM's decision to proceed with its FONSI issuance, particularly since it was specifically conditional upon Section 106 compliance.

**1. The BLM's Determination of the APE Complies with the NHPA**

■ SUWA next argues that the BLM inappropriately narrowed the Veritas Project's area of potential effects by excluding previously uninventoried roads, trails and staging areas. The essence of this argument is that the law required the BLM to construe the APE broadly, which in turn required inclusion of these uninventoried areas. However, determining the APE is a fact-intensive process, and the court relies heavily on the expertise of the BLM. Furthermore, the BLM is entitled to a presumption of validity in performing its discretionary duties such as establishing the APE.[189] In its EA, the BLM required Veritas to employ a "qualified archaeological firm to conduct Class I and Class III cultural surveys" on "all access routes, staging areas, vehicle parking areas, etc., not previously cleared...." [190] There is no

185. Plaintiffs' Brief at 51.

186. 65 Fed.Reg. 77,697, 77,719.

187. *Id.* at 77,719 (emphasis added).

188. *City of Grapevine, Texas v. Department of Trans.,* 17 F.3d 1502, 1508 (D.C.Cir.1994), *cert. denied,* 513 U.S. 1043, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994); *U.S. v. 162.20 Acres of Land, More or Less, Situated in Clay County, State of Miss.,* 733 F.2d 377, 380 (5th Cir. 1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 920 (1985); *City of Alexan-*

dria, Virgina v. Slater, 198 F.3d 862, 872–873 (D.C.Cir.1999), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 27 (2000).

189. *See Udall v. Washington, Va., & Md. Coach Co.,* 398 F.2d 765, 769 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969); *Duesing v. Udall,* 350 F.2d 748, 751–52 (D.C.Cir.1965), *cert. denied,* 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966).

190. AR at 238.

factual evidence that Veritas did not do so, particularly in light of the Utah SHPO's concurrence with the resulting FONSI. In fact, the BLM reports that "a Class III (100%) [survey] was conducted on all portions of the Project within the Areas of Potential Effect. As such, cross-country travel routes have also been inventoried for cultural resources."[191] In the absence of contrary evidence, the court presumes that the BLM performed such an analysis, and that it correctly exercised its expertise regarding the size and subsequent analysis of the APE in this case.

### 2. The FONSI is not Arbitrary or Capricious in Violation of the NHPA

 Finally, SUWA argues that the BLM's FONSI was arbitrarily issued because historic properties would be affected by the Project. Specifically, SUWA points to language in the EA which states that future OHV use in the Project area "would increase the opportunities for damage to and vandalism of cultural resources."[192] The court declines to accept this argument for several reasons.

 First, SUWA failed to raise this argument to the BLM when the BLM released the draft EA for comment. Arguments that have not been raised as part of the Administrative Record are not properly presented here.[193] Second, even if there is a finding of an effect on eligible property, the next step in the administrative process is for the parties to consult on possible mitigation techniques. Here, the BLM had already implemented mitigation methods designed to reduce Project impacts. Finally, SUWA's proposed standard would, in practical application, force a

Section 106 analysis of every acre within the Project boundaries, whether or not the area will be directly affected by the Project. Given the BLM's compliance with NHPA and the mitigation measures it required, it is not reasonable to require a Section 106 analysis of two million acres, when only 381 of those acres will be directly affected.[194] For these reasons, the court concludes that the BLM complied with the requirements of the NHPA.

### Other Causes of Action

As a final point, SUWA has now waived its Second, Fourth, Eighth, and Ninth causes of action.[195] The Federal Defendants and Veritas argue that the court should find that SUWA *involuntarily* waived these causes of actions, which deal with alleged violations of the Endangered Species Act, because it failed to raise them in its opening brief. Since SUWA is not seeking to assert the claims in question, the court does not need to reach the question of whether those claims were voluntarily or involuntarily waived. The court does take note, however, that *Olenhouse v. Commodity Credit Corp.*,[196] cited by the government to support its argument that dismissal should be involuntary, is distinguishable from this case because it dealt with the correctness of filing a summary judgment motion in an administrative appeal, which is not at issue in this case.

### Conclusion

For all these reasons, the court GRANTS Veritas's Motion to Supplement the Record (Doc. # 54–1), GRANTS IN PART and DENIES IN PART the Federal Defendants' Motion to Strike (Doc.

**191.** *Id.* at 125.

**192.** *Id.* at 115.

**193.** *See Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515 (10th Cir.1992).

**194.** *See National Indian Youth Council v. Watt*, 664 F.2d 220, 228 (10th Cir.1981).

**195.** *See* Consolidated Post–Hearing Supplemental Reply Brief at 2–3.

**196.** 42 F.3d 1560, 1580 (10th Cir.1994).

# 69–1), and DENIES SUWA's appeal of the DR/FONSI and its request to stop the Project and until further study is completed.

SO ORDERED.